Justice Stevens
delivered the opinion of the Court.
Petitioner Jalil Abdul-Kabir, formerly known as Ted Calvin Cole,[1] contends that there is a reasonable likelihood that the trial judge’s instructions to the Texas jury that sentenced him to death prevented jurors from giving meaningful consideration to constitutionally relevant mitigating evidence. He further contends that the judgment of the Texas Court of Criminal Appeals (CCA) denying his application for postconviction relief on November 24, 1999, misapplied the law as clearly established by earlier decisions of this Court, thereby warranting relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. *238 § 2254. We agree with both contentions. Although the relevant state-court judgment for purposes of our review under AEDPA is that adjudicating the merits of Cole’s state habeas application, in which these claims were properly raised, we are persuaded that the same result would be dictated by those cases decided before the state trial court entered its judgment affirming Cole’s death sentence on September 26, 1990. Accordingly, we reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.
I
In December 1987, Cole, his stepbrother Michael Hickey, and Michael’s wife, Kelly, decided to rob and kill Kelly’s grandfather, Raymond Richardson, to obtain some cash. Two days later they did so. Cole strangled Richardson with a dog leash; the group then searched the house and found $20 that they used to purchase beer and food. The next day, Michael and Kelly surrendered to the police and confessed. The police then arrested Cole who also confessed.
Cole was tried by a jury and convicted of capital murder. After a sentencing hearing, the jury was asked to answer two special issues:.
“Was the conduct of the defendant, TED CALVIN COLE, that caused the death of the deceased, RAYMOND C. RICHARDSON, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?
“Is there a probability that the defendant, TED CALVIN COLE, would commit criminal acts of violence that would constitute a continuing threat to society?” App. 127,128.[2]
*239 The trial judge instructed the jury to take into consideration evidence presented at the guilt phase as well as the sentencing phase of the trial but made no reference to mitigating evidence. Under the provisions of the Texas criminal code, the jury’s affirmative answers to these two special issues required the judge to impose a death sentence. See Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon 2006).
At the sentencing hearing, the State introduced evidence that Cole pleaded guilty to an earlier murder when he was only 16. Shortly after being released on parole, Cole pleaded guilty to charges of aggravated sexual assault on two boys and was sentenced to 15 more years in prison. As evidence of Cole’s propensity for future dangerousness, the State introduced Cole’s diary which, according to the State’s expert psychiatrist, Dr. Richard Coons, revealed a compulsive attraction to young boys and an obsession with criminal activity. Dr. Coons described Cole as a sociopath who lacked remorse and would not profit or learn from his experiences.
In response, Cole presented two categories of mitigating evidence. The first consisted of testimony from his mother and his aunt, who described his unhappy childhood. Cole’s parents lived together “off and on” for 10 years, over the course of which they had two children, Cole, and his younger sister, Carla. App. 35. Shortly after Cole was born, his father was arrested for robbing a liquor store. Cole’s father deserted the family several times, abandoning the family completely before Cole was five years old. On the last occasion that Cole saw his father, he dropped Cole off a block from where he thought Cole’s mother lived, told Cole to “go *240 find her,” and drove off. Id., at 42. Cole had no contact with his father during the next 10 years. Ibid. After Cole’s father left, his mother found herself unable to care for Cole and his sister and took the children to live with her parents in Oklahoma. Cole’s grandparents were both alcoholics — Cole’s mother was herself a self-described “drunk”— and lived miles away from other children. Eventually, because Cole’s grandparents did not want their daughter or her children living with them, Cole’s mother placed him in a church-run children’s home, although she kept her daughter with her. Over the next five years Cole’s mother visited him only twice. Cole’s aunt, who visited him on holidays, testified that Cole seemed incapable of expressing any emotion and that his father never visited him at all.
The second category of mitigating evidence came from two expert witnesses — a psychologist and the former chief mental health officer for the Texas Department of Corrections— who discussed the consequences of Cole’s childhood neglect and abandonment. Dr. Jarvis Wright, the psychologist, spent 8 to 10 hours interviewing Cole and administering an “extensive battery of psychological tests.” Id., at 63. He testified that Cole had “real problems with impulse control” apparently resulting from “central nervous damage” combined with “all the other factors of [his] background.” Id., at 69. He also testified that Cole had likely been depressed for much of his life, that he had a “painful” background, and that he had “never felt loved and worthwhile in his life.” Id., at 73,86. Providing an analogy for Cole’s early development, Dr. Wright stated that “the manufacturing process [had] botched the raw material horribly.” Id., at 73.
When specifically asked about future dangerousness, Dr. Wright acknowledged that “if Ted were released today on the street, there’s a much greater probability of dangerous behavior than with the rest of us.” Id., at 74. Although he acknowledged the possibility of change or “burn out,” he admitted that Cole would likely pose a threat of *241 future dangerousness until “years from now.” Ibid. Except for his prediction that Cole would change as he grew older, Dr. Wright’s testimony did not contradict the State’s claim that Cole was a dangerous person, but instead sought to provide an explanation for his behavior that might reduce his moral culpability.
Dr. Wendell Dickerson, a psychologist who had not previously examined Cole, observed that it was difficult to predict future dangerousness, but that “violent conduct is predominantly, overwhelmingly the province of the young” with the risk of violence becoming rare as people grow older. Id., at 95. On cross-examination, in response to a hypothetical question about a person with Cole’s character and history, Dr. Dickerson acknowledged that he would be “alarmed” about the future conduct of such a person because “yes, there absolutely is a probability that they would commit... future acts of violence.” Id., at 113. In sum, the strength of Cole’s mitigating evidence was not its potential to contest his immediate dangerousness, to which end the experts’ testimony was at least as harmful as it was helpful. Instead, its strength was its tendency to prove that his violent propensities were caused by factors beyond his control — namely, neurological damage and childhood neglect and abandonment.
It was these latter considerations, however, that the prosecutor discouraged jurors from taking into account when formulating their answers to the special issues. During the voir dire, the prosecutor advised the jurors that they had a duty to answer the special issues based on the facts, and the extent to which such facts objectively supported findings of deliberateness and future dangerousness, rather than their views about what might be an appropriate punishment for this particular defendant. For example, juror Beeson was asked:
“[I]f a person had a bad upbringing, but looking at those special issues, you felt that they [sic] met the standards regarding deliberateness and being a continuing threat *242 to society, could you still vote ‘yes,’ even though you felt like maybe they’d [sic] had a rough time as a kid? If you felt that the facts brought to you by the prosecution warranted a ‘yes’ answer, could you put that out of your mind and just go by the facts?
“[T]hat would not keep you from answering ‘yes,’ just because a person had a poor upbringing, would it?” XI Voir Dire Statement of Facts filed in No. CR88-G043-A (Dist. Ct. Tom Green Cty., Tex., 51st Jud. Dist.), p. 1588.
The prosecutor began his final closing argument with a reminder to the jury that during the voir dire they had “promised the State that, if it met its burden of proof,” they would answer “yes” to both special issues. App. 145. The trial judge refused to give any of several instructions requested by Cole that would have authorized a negative answer to either of the special issues on the basis of “any evidence which, in [the jury’s] opinion, mitigate[d] against the imposition of the Death Penalty, including any aspect of the Defendant’s character or record.” Id., at 115; see also id., at 117-124. Ultimately, the jurors answered both issues in the affirmative, and Cole was sentenced to death.
On direct appeal, the sole issue raised by Cole was that the evidence was insufficient to support the jury’s verdict. The CCA rejected Cole’s claim and affirmed the judgment of the trial court on September 26,1990.
11
On March 2, 1992, the lawyer who then represented Cole filed an application for a writ of habeas corpus in the Texas trial court, alleging 21 claims of error.[3] Counsel later with *243 drew, and after delays caused in part by a letter from Cole to the trial judge stating that he wished to withdraw his “appeal,” the judge ultimately “had petitioner bench warranted” to a hearing on September 4,1998. Id., at 152-153. During that hearing, Cole advised the court that he wished to proceed with his habeas proceedings and to have the CCA appoint counsel to represent him. Without counsel having been appointed to represent Cole, and without conducting an evidentiary hearing, the trial court entered its findings and conclusions recommending denial of the application.
Three of Cole’s 21 claims related to the jury’s inability to consider mitigating evidence. The trial judge rejected the first — “that his mitigating evidence was not able to be properly considered and given effect by the jury under the special issues,” id., at 157 — because he concluded that the record, and “especially” the testimony of the two expert witnesses, “provide[d] a basis for the jury to sufficiently consider the mitigating evidence offered by petitioner,”[4] id., at 161. With respect to Cole’s second claim, the judge agreed that appellate counsel had been ineffective for failing to assign error based on “the trial court’s failure to instruct the jury on mitigating evidence as contemplated by the Pendry [sic] decision.” Id., at 166. He nevertheless found that the result on appeal would have been the same had the point been raised. Ibid. On the third claim relating to mitigating evidence, the judge rejected Cole’s argument that the trial court’s failure to specifically instruct the jury to consider *244 mitigating evidence and offer a definition of “mitigating” was error. Id., at 173.
Over the dissent of two members of the court, and after adopting the trial court’s findings of fact and conclusions of law with only minor changes, the CCA denied Cole’s application for state collateral relief. Ex parte Cole, No. 41,673-01 (Nov. 24, 1999) (per curiam), App. 178-179.
Ill
After the Federal District Court granted Cole’s motion for the appointment of counsel, he filed a timely petition for a federal writ of habeas corpus pursuant to 28 U. S. C. § 2254. His principal claim then, as it is now, was that the sentencing jury “was unable to consider and give effect to the mitigating evidence in his case,” in violation of the Constitution. Cole v. Johnson, Civ. Action No. 6:00-CV-014-C (ND Tex., Mar. 6, 2001), p. 5, App. 184.
In its opinion denying relief, the District Court began by summarizing Cole’s mitigating evidence, highlighting his “destructive family background.” Ibid. The court then correctly described our decision in Penry I, 492 U. S. 302 (1989), in these words:
“In [Penry] the Supreme Court found that when the defendant places mitigating evidence before the jury, Texas juries must be given instructions which allow the jury to give effect to that mitigating evidence and to express its reasoned moral response to that evidence in determining whether to impose the death penalty.”[5] Civ. Action No. 6:00-CV-014-C, at 8-9, App. 188.
The court next noted that the Fifth Circuit had formulated its own analysis for evaluating Penry claims. Under that *245 analysis, for mitigating evidence to be constitutionally relevant, it “must show (1) a uniquely severe permanent handicap with which the defendant is burdened through no fault of his own,... and (2) that the criminal act was attributable to this severe permanent condition” Civ. Action No. 6:00— CV-014-C, at 9, App. 189 (quoting Davis v. Scott, 51 F. 3d 457, 460-461 (CA5 1995); internal quotation marks omitted; emphasis added). Ultimately, Cole’s inability to show a “nexus” between his troubled family background and his commission of capital murder doomed his Penry claim. Civ. Action No. 6:00-CV-014-C, at 13, App. 193.
The Court of Appeals denied Cole’s application for a certificate of appealability (COA), Cole v. Dretke, 99 Fed. Appx. 523 (CA5 2004), holding that “reasonable jurists would not debate the district court’s conclusion that Cole’s evidence was not constitutionally relevant mitigating evidence,” Cole v. Dretke, 418 F. 3d 494,498 (CA5 2005). Shortly thereafter, however, we held that the Fifth Circuit’s “screening test” for determining the “‘constitutional relevance’” of mitigating evidence had “no foundation in the decisions of this Court.” Tennard v. Dretke, 542 U. S. 274, 284 (2004). Accordingly, we vacated its order denying a COA in this case and remanded for further proceedings. Abdul-Kabir v. Dretke, 543 U. S. 985 (2004). On remand, the Court of Appeals reviewed Cole’s Penry claim on the merits and affirmed the District Court’s judgment denying the writ.
Focusing primarily on the testimony of petitioner’s two experts rather than that of his mother and his aunt, the Court of Appeals reviewed our recent decisions and concluded “that the Texas special issues allowed the jury to give ‘full consideration and full effect’ to the mitigating evidence that Cole presented at the punishment phase of his trial.”[6] *246 418 F. 3d, at 511. With two judges dissenting, the court denied the petition for rehearing en banc.[7] We consolidated this case with Brewer v. Quarterman, post, p. 286, and granted certiorari, 549 U. S. 974 (2006).
IV
Because Cole filed his federal habeas petition after the effective date of AEDPA, the provisions of that Act govern the scope of our review. We must therefore ask whether the CCA’s adjudication of Cole’s claim on the merits “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U. S. C. § 2254(d)(1). We conclude that it did.
A careful review of our jurisprudence in this area makes clear that well before our decision in Penry I, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future. Three of the five cases decided on the same day in 1976 — Woodson v. North Carolina, 428 U. S. 280, Proffitt v. Florida, 428 U. S. 242, and Jurek v. Texas, 428 U. S. 262 — identified the background principles we would apply in later cases to evaluate specific rules inhibiting the jury’s ability to give meaningful effect to such mitigating evidence.
*247 In Woodson v. North Carolina, we invalidated a statute that made death the mandatory sentence for all persons convicted of first-degree murder. One of the statute’s constitutional shortcomings was its “failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death.” 428 U. S., at 303 (plurality opinion).[8] In Proffitt v. Florida and Jurek v. Texas, the joint opinions rejected facial challenges to the sentencing statutes enacted in Florida and Texas, assuming in both cases that provisions allowing for the unrestricted admissibility of mitigating evidence would ensure that a sentencing jury had adequate guidance in performing its sentencing function.[9] As a majority of the Court later acknowledged, our holding in Jurek did not preclude the possibility that the Texas sentencing statute might be found unconstitutional as applied in a particular case. See n. 15, infra.
Two years later, in Lockett v. Ohio, 438 U. S. 586 (1978), a plurality concluded “that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defend *248 ant proffers as a basis for a sentence less than death.” Id., at 604 (footnote omitted). Because Ohio’s death penalty statute was inconsistent with this principle, it was declared unconstitutional. The plurality noted the possible tension between a holding that the Ohio statute was invalid and our decisions in Proffitt and Jurek upholding the Florida and Texas statutes, but distinguished those cases because neither statute “clearly operated at that time to prevent the sentencer from considering any aspect of the defendant’s character and record or any circumstances of his offense as an independently mitigating factor.” 438 U. S., at 607.
While Chief Justice Burger’s opinion in Lockett was joined by only three other Justices, the rule it announced was endorsed and broadened in our subsequent decisions in Ed-dings v. Oklahoma, 455 U. S. 104 (1982), and Skipper v. South Carolina, 476 U. S. 1 (1986). In those cases, we emphasized the severity of imposing a death sentence and that “the sentencer in capital cases must be permitted to consider any relevant mitigating factor.”[10] Eddings, 455 U. S., at 112 (emphasis added).
In the wake of our decision in Lockett, Ohio amended its capital sentencing statute to give effect to Lockett's holding.[11] Neither Florida nor Texas did so, however, until after our unanimous decision in Hitchcock v. Dugger, 481 U. S. 393 (1987), unequivocally confirmed the settled quality of the Lockett rule. As Justice Scalia’s opinion for the Court *249 explained, the defendant had introduced some rather atypical mitigating evidence that was not expressly authorized by the Florida statute:
“In the sentencing phase of this case, petitioner’s counsel introduced before the advisory jury evidence that as a child petitioner had the habit of inhaling gasoline fumes from automobile gas tanks; that he had once passed out after doing so; that thereafter his mind tended to wander; that petitioner had been one of seven children in a poor family that earned its living by picking cotton; that his father had died of cancer; and that petitioner had been a fond and affectionate uncle to the children of one of his brothers.” 481 U. S., at 397.
As the opinion further explained, the Florida courts had construed the state statute to preclude consideration of mitigating factors unmentioned in the statute. Accordingly, despite our earlier decision in Proffitt upholding the statute against a facial challenge, it was necessary to set aside Hitchcock’s death sentence. We explained:
“We think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of Skipper v. South Carolina, 476 U. S. 1 (1986), Eddings v. Oklahoma, 455 U. S. 104 (1982), and Lockett v. Ohio, 438 U. S. 586 (1978) (plurality opinion). Respondent has made no attempt to argue that this error was harmless, or that it had no effect on the jury or the sentencing judge. In the absence of such a showing our cases hold that the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid. See Skipper, supra (evidence that defendant had adapted well to prison life); Eddings, supra (evidence of 16-year-old defendant’s *250 troubled family history and emotional disturbance).” 481 U. S., at 398-399.
Of course, our reference to “exclusion” of the evidence did not refer to its admissibility, but rather to its exclusion from meaningful consideration by the jury. Had Jurek and Proffitt truly stood for the proposition that the mere availability of relevant mitigating evidence was sufficient to satisfy the Constitution’s requirements, Hitchcock could never have been decided as it was.[12]
In the year following our decision in Hitchcock, we made clear that sentencing under the Texas statute, like that under the Florida statute, must accord with the Lockett rule. In Franklin v. Lynaugh, 487 U. S. 164, 172, 177, 183 (1988), the plurality rejected the claim that the judge’s instructions did not allow the jury to give adequate weight to whatever “ ‘residual doubts’ ” it may have had concerning the defendant’s guilt, or to evidence of the petitioner’s good behavior while in prison. That particular holding is unremarkable because we have never held that capital defendants have an *251 Eighth Amendment right to present “residual doubt” evidence at sentencing, see Oregon v. Guzek, 546 U. S. 517, 523-527 (2006), and in most cases evidence of good behavior in prison is primarily, if not exclusively, relevant to the issue of future dangerousness. What makes Franklin significant, however, is the separate opinion of Justice O’Connor, and particularly those portions of her opinion expressing the views of five Justices, see infra, at 253, and n. 15. After summarizing the cases that clarified Jurek’s holding,[13] she wrote:
“In my view, the principle underlying Lockett, Ed-dings, and Hitchcock is that punishment should be directly related to the personal culpability of the criminal defendant.
“ ‘[E]vidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or *252 to emotional and mental problems, may be less culpable than defendants who have no such excuse.... Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant’s background, character, and crime.’ California v. Brown, 479 U. S. 538, 545 (1987) (O’Connor, J., concurring) (emphasis in original).
“In light of this principle it is clear that a State may not constitutionally prevent the sentencing body from giving effect to evidence relevant to the defendant’s background or character or the circumstances of the offense that mitigates against the death penalty. Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration.
“Under the sentencing procedure followed in this case the jury could express its views about the appropriate punishment only by answering the special verdict questions regarding the deliberateness of the murder and the defendant’s future dangerousness. To the extent that the mitigating evidence introduced by petitioner was relevant to one of the special verdict questions, the jury was free to give effect to that evidence by returning a negative answer to that question. If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant’s moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its ‘reasoned moral response’ to that evidence.” 487 U. S., at 184-185 (opinion concurring in judgment) (emphasis added).
Justice O’Connor’s opinion for the Court in Penry I endorsed the views she had expressed in Franklin and unques *253 tionably governs the facts of this ease.[14] Penry contended that his mitigating evidence of mental retardation and an abusive childhood provided a basis for a sentence of life imprisonment rather than death and that the jury should have been instructed that it could consider that evidence when making its sentencing decision. In response to that contention, our opinion first held that Penry was not asking us to make new law because he was relying on a rule that was “dictated” by earlier cases, see n. 10, supra, and explained why Justice O’Connor’s separate opinion in Franklin correctly defined the relevant rule of law.[15] In Franklin, we *254 noted, “both the concurrence and the dissent stressed that ‘the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration’ in imposing sentence.” 492 U. S., at 321 (citing Franklin, 487 U. S., at 185 (O’Connor, J., concurring in judgment); id., at 199 (Stevens, J., dissenting)).
Applying that standard, we held that neither the “deliberateness” nor the “future dangerousness” special issue provided the jury with a meaningful opportunity to give effect to Penry’s mitigating evidence. With respect to the former, we explained:
“In the absence of jury instructions defining ‘deliberately’ in a way that would clearly direct the jury to consider fully Penry’s mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry’s mental retardation and history of abuse in answering the first special issue. Without such a special instruction, a juror who believed that Penry’s retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime ‘deliberately.’ Thus, we cannot be sure that the jury’s answer to the first special issue reflected a ‘reasoned moral response’ to Penry’s mitigating evidence.” 492 U. S., at 323.
With respect to the future dangerousness issue, we emphasized the fact that Penry’s evidence of mental retardation was relevant only as an aggravating factor. Id., at 323-324. *255 More broadly, we noted that the evidence of Penry’s mental retardation and childhood abuse functioned as a “two-edged sword,” because it “may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.” Id., at 324. We therefore held that, in the absence of an appropriate instruction directing the “jury to consider fully” mitigating evidence as it bears on the extent to which a defendant is undeserving of a death sentence, “we cannot be sure” that it did so. Id., at 323. As our discussion of the deliberateness issue demonstrates, we did not limit our holding in Penry I to mitigating evidence that can only be viewed as aggravating. When the evidence proffered is double edged, or is as likely to be viewed as aggravating as it is as mitigating, the statute most obviously fails to provide for adequate consideration of such evidence.[16]
*256 The former special issues (as composed at the time of both Penry’s and Cole’s sentencing proceedings) provided an adequate vehicle for the evaluation of mitigating evidence offered to disprove deliberateness or future dangerousness. As Judge Reavley noted in his opinion for the Court of Appeals in Penry I, however, they did not tell the jury as to what “to do if it decided that Penry, because of retardation, arrested emotional development and a troubled youth, should not be executed.” Id., at 324 (internal quotation marks omitted).
V
In recommending denial of Cole’s application for collateral relief, the Texas trial judge did not analyze Penry I itself. Under the framework set forth in Penry I,[17] the testimony of Cole’s mother and aunt, as well as the portions of the expert testimony suggesting that his dangerous character may have been the result of his rough childhood and possible neurological damage, were not relevant to either of the special^ ver *257 diet questions, except, possibly, as evidence supporting the State’s argument that Cole would be dangerous in the future. This would not satisfy the requirement of Penry I, however, that the evidence be permitted its mitigating force beyond the scope of the special issues. Therefore, it would have followed that those questions failed to provide the jury with a vehicle for expressing its “reasoned moral response” to that evidence.
Instead of relying on Penry I, the trial judge relied on three later Texas cases and on our opinion in Graham v. Collins, 506 U. S. 461 (1993), as having held that nine different categories of mitigating evidence — including a tioubled family background, bipolar disorder, low IQ, substance abuse, paranoid personality disorder, and child abuse — were sufficiently considered under the Texas special issues.[18] App. 159-160. Applying those cases, the judge defined the legal issue “whether the mitigating evidence can be sufficiently considered” as one that “must be determined on a case by case basis, depending on the nature of the mitigating evidence offered and whether there exists other testimony in the record that would allow consideration to be given.” Id., at 160. As we have noted, in endorsing this formulation of *258 the issue, neither the trial judge nor the CCA had the benefit of any input from counsel representing petitioner. See Part II, supra. In our view, denying relief on the basis of that formulation of the issue, while ignoring the fundamental principles established by our most relevant precedents, resulted in a decision that was both “contrary to” and “involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U. S. C. § 2254(d).
The state court’s primary reliance on Graham, to the exclusion of our other cases in this line of jurisprudence, was misguided. In Graham, we held that granting collateral relief to a defendant who had been sentenced to death in 1984 would require the announcement of a new rule of constitutional law in contravention of Teague v. Lane, 489 U. S. 288 (1989). In reaching that conclusion we relied heavily on the fact that in 1984 it was reasonable for judges to rely on the interpretation of Jurek that the plurality had espoused in Franklin. See 506 U. S., at 468-472; see also n. 15, supra. But as we have explained, in both Franklin and Penry I, a majority of the Court ultimately rejected the plurality’s interpretation of Jurek. Neither Franklin nor Penry I was inconsistent with Graham's narrow holding, but they do suggest that our later decisions — including Johnson v. Texas, 509 U. S. 350 (1993), in which we refused to adopt the rule that Graham sought[19] — are of more relevance to Cole’s case than Graham. The relevance of those cases lies not in their results — in several instances, we concluded, after applying the relevant law, that the special issues provided for adequate consideration of the defendant’s mitigating evi *259 dence[20] — but in their failure to disturb the basic legal principle that continues to govern such cases: The jury must have a “meaningful basis to consider the relevant mitigating qualities” of the defendant’s proffered evidence.[21] Johnson, 509 U. S., at 869; see also Graham, 506 U. S., at 474 (explaining that Penry was entitled to additional instructions “[b]eeause it was impossible [for the jury] to give meaningful mitigating effect to Penry’s evidence by way of answering the special issues”).
Before turning to those more recent cases, it is appropriate to identify the reasons why the CCA’s ruling was not a reasonable application of Penry I itself. First, the ruling ignored the fact that even though Cole’s mitigating evidence may not have been as persuasive as Penry’s, it was relevant to the question of Cole’s moral culpability for precisely the same reason as Penry’s. Like Penry’s evidence, Cole’s evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence. Second, the judge’s assumption that it would be appropriate to look at “other testimony in the record” to determine whether the jury could give mitigating effect to the testimony of Cole’s mother and aunt is neither reasonable nor supported by the Penry opinion. App. 160. Third, the fact that the jury could give mitigating effect to some of the experts’ testimony, namely, then-predictions that Cole could be expected to become less dangerous as he aged, provides no support for the conclusion *260 that the jury understood it could give such effect to other portions of the experts’ testimony or that of other witnesses. In sum, the judge ignored our entire line of cases establishing the importance of allowing juries to give meaningful effect to any mitigating evidence providing a basis for a sentence of life rather than death. His recommendation to the CCA was therefore unsupported by either the text or the reasoning in Penry I.
VI
The same principles originally set forth in earlier cases such as Lockett and Eddings have been articulated explicitly by our later cases, which explained that the jury must be permitted to “consider fully” such mitigating evidence and that such consideration “would be meaningless” unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence. Penry I, 492 U. S., at 321, 323 (internal quotation marks omitted); Graham, 506 U. S., at 475 (acknowledging that a “constitutional defect” has occurred not only when a jury is “precluded from even considering certain types of mitigating evidence,” but also when “the defendant’s evidence [i]s placed before the sentencer but the sentencer ha[s] no reliable means of giving mitigating effect to that evidence”).
Four of our more recent cases lend support to the conclusion that the CCA’s decision was unsupported by either the text or the reasoning of Penry I.[22] In Johnson v. Texas, we held that the Texas special issues allowed adequate consideration of the petitioner’s youth as a mitigating circumstance. Indeed, we thought it “strainfed] credulity to suppose that *261 the jury would have viewed the evidence of petitioner’s youth as outside its effective reach” because its relevance was so obvious. 509 U. S., at 368. There is of course a vast difference between youth — a universally applicable mitigating circumstance that every juror has experienced and which necessarily is transient — and the particularized childhood experiences of abuse and neglect that Penry I and Cole described — which presumably most jurors have never experienced and which affect each individual in a distinct manner.
Evidence of youth, moreover, has special relevance to the question of future dangerousness. A critical assumption motivating the Court’s decision in Johnson was that juries would in fact be able to give mitigating effect to the evidence, albeit within the confines of the special issues. See 509 U. S., at 370 (“If any jurors believed that the transient qualities of petitioner’s youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner’s future dangerousness”). Prosecutors in some subsequent cases, however, have undermined this assumption, taking pains to convince jurors that the law compels them to disregard the force of evidence offered in mitigation. Cole’s prosecution is illustrative: The State made jurors “promise” they would look only at the questions posed by the special issues, which, according to the prosecutor, required a juror to “put . . . out of [his] mind” Cole’s mitigating evidence and “just go by the facts.” Supra, at 242. Arguments like , these are at odds with the Court’s understanding in Johnson that juries could and would reach mitigating evidence proffered by a defendant. Nothing in Johnson forecloses relief in these circumstances. See 509 U. S., at 369 (“Penry remains the law and must be given a fair reading”).
This conclusion derives further support from the fact that, in Johnson, the Court understood that the defendant’s evidence of youth — including testimony from his father that *262 “his son’s actions were due in large part to his youth,” id., at 368, and counsel’s corresponding arguments that the defendant could change as he grew older — was “readily comprehended as a mitigating factor,” id., at 369, in the context of the special issues. The evidence offered in this case, however, as well as that offered by the petitioner in Brewer, post, at 289-290, and n. 1, is closer in nature to that offered by the defendant in Penry I than that at issue in Johnson. While the consideration of the defendant’s mitigating evidence of youth in Johnson could easily have directed jurors toward a “no” answer with regard to the question of future dangerousness, a juror considering Cole’s evidence of childhood neglect and abandonment and possible neurological damage or Brewer’s evidence of mental illness, substance abuse, and a troubled childhood could feel compelled to provide a “yes” answer to the same question, finding himself without a means for giving meaningful effect to the mitigating qualities of such evidence.[23] In such a case, there is a reasonable likelihood that the special issues would preclude that juror from giving meaningful consideration to such mitigating evidence, as required by Penry I. See Johnson, 509 U. S., at 367 (explaining that in Boyde v. California, 494 U. S. 370, *263 380 (1990), “we held that a reviewing court must determine ‘whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence’ ”).
In three later cases, we gave Penry I the “fair reading” required by Johnson and repudiated several Fifth Circuit precedents providing the basis for its narrow reading of that case. First, in our review of Penry’s resentencing, at which the judge had supplemented the special issues with a nullification instruction, we again concluded that the jury had not been provided with an adequate “‘vehicle for expressing its “reasoned moral response” ’ ” to his mitigating evidence. Penry v. Johnson, 532 U. S. 782, 797 (2001) (Penry II). Indeed, given that the resentencing occurred after the enactment of AEDPA, we concluded (contrary to the views of the Fifth Circuit, which had denied Penry a COA) that the GCA’s judgment affirming the death sentence was objectively unreasonable. Id., at 803-804. Second, and as we have already noted, in Tennard we held that the Fifth Circuit’s test for identifying relevant mitigating evidence was incorrect. 542 U. S., at 284. Most recently, in Smith v. Texas, 543 U. S. 37 (2004) (per curiam), and again contrary to the views of the Fifth Circuit, we held that a nullification instruction that was different from the one used in Penry’s second sentencing hearing did not foreclose the defendant’s claim that the special issues had precluded the jury from “expressing a ‘reasoned moral response’ to all of the evidence relevant to the defendant’s culpability.” Id., at 46.
VII
Our line of cases in this area has long recognized that before a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant’s moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history *264 and characteristics and the circumstances of the offense.[24] As Chief Justice Burger wrote in Lockett:
“There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant’s character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.” 438 U. S., at 605.
Our cases following Lockett have made clear that when the jury is not permitted to give meaningful effect or a “reasoned moral response” to a defendant’s mitigating evidence — because it is forbidden from doing so by statute or a judicial interpretation of a statute — the sentencing process is fatally flawed.[25] For that reason, our post-Penry cases *265 are fully consistent with our conclusion that the judgment of the Court of Appeals in this case must be reversed. The case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 For purposes of consistency with testimony given by witnesses at trial and sentencing, we refer to petitioner throughout the opinion by his given name, Ted Cole.

 These were the two standard Texas special issues in place at the time of Cole’s sentencing. In 1991, the Texas Legislature amended the special issues in response to this Court’s decision in Penry v. Lynaugh, 492 U. S. 302 (1989) (Penry I), to include language instructing the jury to decide *239 “[wjhether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant’s character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.” Tex. Code Crim. Proc. Ann., Art. 37.071, § 2(e)(1) (Vernon 2006).

 Although Cole had not raised any of the 21 claims presented in his state habeas application on direct appeal — including his claim that the jury heard significant mitigating evidence which it could neither consider nor give effect to under the Texas sentencing statute, in violation of Penry I — under state law, his Penry claim remained cognizable on state habeas review. See Ex parte Kunkle, 852 S. W. 2d 499, 502, n. 3 (Tex. Crim. App. *243 1993) (en banc) (holding that “we have held that [allegations of Penry error occurring in cases tried before Penry] are cognizable via habeas corpus despite an applicant’s failure to raise them on direct appeal”). Nor did Cole’s failure to raise this claim on direct appeal affect its later review under AEDPA by the United States Court of Appeals for the Fifth Circuit. See Jackson v. Johnson, 150 F. 3d 520, 523 (CA5 1998) (holding that Texas’ postconviction procedures provide petitioners “adjudication on the merits” sufficient to satisfy 28 U. S. C. § 2254(d)).

 The trial judge also noted that there were “no controverted, previously unresolved factual issues regarding petitioner’s Pendry [sic] claim.” App. 161.

 The contrast between the District Court’s succinct statement of Penry Ps holding and the prosecutor’s explanation at voir dire of the jurors’ duty to answer the special issues on the basis of the facts presented and not their views about Cole’s moral culpability, see Part I, supra, could not be more stark.

 The Court of Appeals distinguished Penry I on the ground that Ferny's evidence of mental retardation could only have been considered as aggravating, whereas this “record does not suggest that the jury viewed Cole’s mitigating evidence as an aggravating factor only .... [T]his evidence *246 fits well within the broad scope of the future dangerousness special issue ... 418 F. 3d, at 506-507, and n. 54.

 In his dissent, Judge Dennis argued that the panel had improperly “used another Fifth Circuit gloss upon a Supreme Court decision, i. e., the double edged evidence limitation of Penry I, that has no basis in the Supreme Court decisions, to avoid confronting the real issue.” Cole v. Dretke, 443 F. 3d 441, 442 (CA5 2006).

 The opinion also referred to a proposition that “cannot fairly be denied — that death is a punishment different from all other sanctions in kind rather than degree,” and continued on to conclude that “[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.” Woodson, 428 U. S., at 303-304.

 “By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function.” Jurek, 428 U. S., at 276 (joint opinion of Stewart, Powell, and Stevens, JJ.); see also Proffitt, 428 U. S., at 257-258 (same).

 In Penry 1 itself, the Court noted that the rule sought by Penry— “that when such mitigating evidence is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed — is not a ‘new rule’ under Teague [v. Lane, 489 U. S. 288 (1989),] because it is dictated by Eddings and Lockett.” 492 U. S., at 318-319.

See Ohio Rev. Code Ann. §2929.04(B)(7) (Anderson 1982) (amended 1981) (adding, as a mitigating circumstance, “[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death”).

 To the extent that Jurek implied at the time it was decided that all that was required by the Constitution was that the defense be authorized to introduce all relevant mitigating circumstances, and that such information merely be before the jury, it has become clear from our later cases that the mere ability to present evidence is not sufficient. The only mitigating evidence presented in Jurek — offered to rebut the State’s witnesses’ testimony about Jurek’s bad reputation in the community — appears to have consisted of Jurek’s father’s testimony that Jurek had “always been steadily employed since he had left school and that he contributed to his family’s support.” 428 U. S., at 267. Therefore, the question presented in our later cases — namely, whether the jury was precluded from giving meaningful effect to mitigating evidence, particularly that which may go to a defendant’s lack of moral culpability — was not at issue in that case. When we deemed the Texas sentencing scheme constitutionally adequate in Jurek, we clearly failed to anticipate that when faced with various other types of mitigating evidence, the Texas special issues would not provide the sentencing jury with the requisite “adequate guidance.”

 “In Jurek v. Texas, 428 U. S. 262 (1976), this Court held that the Texas capital sentencing procedures satisfied the Eighth Amendment requirement that the sentencer be allowed to consider circumstances mitigating against capital punishment. It was observed that even though the statute did not explicitly mention mitigating circumstances, the Texas Court of Criminal Appeals had construed the special verdict question regarding the defendant’s future dangerousness to permit jury consideration of the defendant’s prior criminal record, age, mental state, and the circumstances of the crime in mitigation. Id., at 271-273. Since the decision in Jurek, we have emphasized that the Constitution guarantees a defendant facing a possible death sentence not only the right to introduce evidence mitigating against the death penalty but also the right to consideration of that evidence by the sentencing authority. Lockett v. Ohio, 438 U. S. 586 (1978), established that a State may not prevent the capital sentencing authority “from giving independent mitigating weight to aspects of the defendant’s character and record and to circumstances of the offense proffered in mitigation.’ Id., at 605 (plurality opinion). We reaffirmed this conclusion in Eddings v. Oklahoma, 455 U. S. 104 (1982), and in Hitchcock v. Dugger, 481 U. S. 393 (1987).” Franklin, 487 U. S., at 183-184 (emphasis added).

 The Chief Justice’s dissent incorrectly assumes that our holding today adopts the rule advocated by the petitioner in Graham v. Collins, 506 U. S.- 461 (1993), namely, that “ ‘a defendant is entitled to special instructions whenever he can offer mitigating evidence that has some arguable relevance beyond the special issues.’ ” Post, at 271 (quoting Graham, 506 U. S., at 476; emphasis in Graham). The rule that we reaffirm today — a rule that has been clearly established since our decision in Penry I — is this: Special instructions are necessary when the jury could not otherwise give meaningful effect to a defendant’s mitigating evidence. The rule is narrower than the standard urged by Graham because special instruction is not required when mitigating evidence has only a tenuous connection — '"some arguable relevance” — to the defendant’s moral culpability. But special instruction is necessary when the defendant’s evidence may have meaningful relevance to the defendant’s moral culpability “beyond the scope of the special issues.” Penry I, 492 U. S., at 322-323. Despite the dissent’s colorful rhetoric, it cites no post-Penry I cases inconsistent with this reading of its holding.

 “In Franklin, however, the five concurring and dissenting Justices did not share the plurality’s categorical reading of Jurek. In the plurality’s view, Jurek had expressly and unconditionally upheld the manner in which mitigating evidence is considered under the special issues. [487 U. S.,] at 179-180, and n. 10. In contrast, five Members of the Court read Jurek as not precluding a claim that, in a particular case, the jury was unable to fully consider the mitigating evidence introduced by a defendant in answering the special issues. 487 U. S., at 183 (O’Connor, J., concurring in judgment); id., at 199-200 (Stevens, J., dissenting). Indeed, both the concurrence and the dissent understood Jurek as resting fundamentally on the express assurance that the special issues would permit the jury to fully consider all the mitigating evidence a defendant introduced that was rele *254 vant to the defendant’s background and character and to the circumstances of the offense.” Id., at 320-321; see also id., at 318 (“[T]he facial validity of the Texas death penalty statute had been upheld in Jurek on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present”).

 It is also clear that Penry I applies in eases involving evidence that is neither double edged nor purely aggravating, because in some cases a defendant’s evidence may have mitigating effect beyond its ability to negate the special issues. See, e. g., Tennard v. Dretke, 542 U. S. 274, 288-289 (2004) (holding that petitioner was entitled to a COA on his Penry claim where his evidence of low IQ and impaired intellectual functioning had “mitigating dimension beyond the impact it has on the individual’s ability to act deliberately”). In Tennard, the majority declined to accept the dissent’s argument that the petitioner’s evidence of low intelligence did “not necessarily create the Penry I ‘two-edged sword,’ ” and therefore could be given adequate mitigating effect within the context of the future dangerousness special issue. 542 U. S., at 293 (Rehnquist, C. J., dissenting). Cf. Johnson v. Texas, 509 U. S. 350, 386 (1993) (O’Connor, J., dissenting) (“The Court today holds that ‘the constitutionality turns on whether the [special] questions allow mitigating factors not only to be considered . . . , but also to be given effect in all possible ways, incl'uding ways that the questions do not permit’ ” (quoting Penry I, 492 U. S., at 355 (Scalia, J., concurring in part and dissenting in part); emphasis in original)); cf. also Smith v. Texas, 543 U. S. 37, 41, 46-48 (2004) (per curiam) (reversing the CCA’s denial of postconvietion relief because the special issues did not provide an adequate vehicle for expressing a “ ‘reasoned moral response’” to petitioner’s evidence of low IQ and a troubled upbringing).

 The linchpin of The Chief Justice’s dissent is his assumption that Justice O’Connor’s opinions in Franklin and Penry I merely described two ad hoc judgments — see post, at 269-270 — rather than her understanding of the governing rule of law announced in Lockett, Eddings, and Hitchcock v. Dugger, 481 U. S. 393 (1987). In his view, our line of cases in this area has flip-flopped, depending on the composition of the majority, rather than slowly defining core principles by eliminating those interpretations of the rule that are unsupportable. The fact that Justice O’Connor’s understanding of the law was confirmed by the Court in Penry I in 1989 — well before AEDPA was enacted — is a sufficient response to most of the rhetoric in the dissent. Neither Justice O’Connor’s opinion for the Court in Penry I, nor any other opinion she joined, ever endorsed the ‘“some arguable relevance’ ” position described by The Chief Justice, see post, at 271, 279, which mistakenly interprets our opinion as adopting the rule that the dissenters in Franklin and Saffle v. Parks, 494 U. S. 484 (1990), would have chosen, see post, at 271, 279. The fact that the Court never endorsed that broader standard is fully consistent with our conclusion that the narrower rule applied in Penry I itself is “clearly established.” Arguments advanced in later dissenting opinions do not affect that conclusion.

 The Texas cases relied upon by the court were Garcia v. State, 919 S. W. 2d 370, 398-399 (Crim. App. 1996) (holding that, in light of the fact that Garcia received a “Penry” instruction (included in the amended Texas special issues), which instructed the jury to consider the defendant’s character and background in determining whether to impose life rather than death, he was not entitled to any special instructions requiring the jury to consider his drug use, alcoholism, and family background as mitigating evidence); Mines v. State, 888 S. W. 2d 816, 818 (Crim. App. 1994) (holding, on remand after Johnson, that Mines’ mitigating evidence of bipolar disorder was “well within the effective reach of the jury”); and Zimmerman v. State, 881 S. W. 2d 360, 362 (Crim. App. 1994) (holding, also on remand after Johnson, that Zimmerman's “mitigating” evidence of low IQ, past substance abuse, a diagnosis of paranoid personality disorder, and a disruptive family environment did not warrant an additional instruction under Johnson or Penry I).

 Graham claimed that the Texas system had not “allowed for adequate consideration of mitigating evidence concerning his youth, family background, and positive character traits”; in Johnson, we declined to adopt such a rule, even without the Teague bar that prevented us from doing so in Graham. 509 U. S., at 365-366.

 This fact should be reassuring to those who fear that the rule we endorse today — and which we have endorsed since Penry 7 — “would require a new sentencing in every case.” Post, at 271 (Roberts, C. J., dissenting).

 A jury may be precluded from doing so not only as a result of the instructions it is given, but also as a result of prosecutorial argument dictating that such consideration is forbidden. See Part VI, infra.

 Because The Chief Justice’s only concern is with the proper application of AEDPA, he finds it unnecessary to define the rule that he thinks post-Penry I cases either did or should have applied. What is most relevant under AEDPA, however, is the holdings set forth in majority opinions, rather than the views of dissenters who supported a different understanding of the law at the time those opinions wére written.

 We came to the same conclusion in Graham, after distinguishing the defendant’s mitigating evidence in that case from that offered by the defendant in Penry I:
“The jury was not forbidden to accept the suggestion of Graham’s lawyers that his brief spasm of criminal activity in May 1981 was properly viewed, in light of his youth, his background, and his character, as an aberration that was not likely to be repeated. Even if Graham’s evidence, like Penry’s, had significance beyond the scope of the first special issue, it is apparent that Graham’s evidence — unlike Penry’s — had mitigating relevance to the second special issue concerning his likely future dangerousness. Whereas Penry’s evidence compelled an affirmative answer to that inquiry, despite its mitigating significance, Graham’s evidence quite readily could have supported a negative answer.” 506 U. S., at 475-476.

 In Graham, we acknowledged that Penry I did not “effecft] a sea change in this Court’s view of the constitutionality of the former Texas death penalty statute.” Graham, 506 U. S., at 474. The reason, of course, that this was not the case is because the rule set forth in Penry I was merely an application of the settled Lockett-Eddings-Hitchcock rule described by Justice O’Connor in her opinions.

 Without making any attempt to explain how the jury in either this case or in Brewer v. Quarterman, post, p. 286, could have given “meaningful effect” or a “reasoned moral response” to either defendant’s mitigating evidence, The Chief Justice concludes his dissent by lamenting the fact that the views shared by Justice O’Connor’s concurrence and the dissenters in Franklin in 1988 — and later endorsed in Penry I — “actually represented ‘clearly established’ federal law at that time.” Post, at 280. To his credit, his concluding sentence does not go so far as to state that he favors a “tunc pro nunc” rejection of those views, an endorsement of the views expressed by the four dissenters in Penry I, or even agreement with the Fifth Circuit’s recently rejected test for identifying relevant miti *265 gating evidence. See Nelson v. Quarterman, 472 F. 3d 287, 291-293 (2006) (en banc) (recognizing the “now-defunct” nature of the Fifth Circuit’s “‘constitutional-relevance’ test” post-Tennard and that a “‘full-effect’ ” standard — meaning that “a juror be able to express his reasoned moral response to evidence that has mitigating relevance beyond the scope of the special issues” — was “clearly established” for purposes of AEDPA in 1994, when Nelson’s conviction became final).