MERRITT, Circuit Judge,
dissenting.
Dixon has a long-established, unalloyed federal right under the Eighth Amendment to offer and have the jury receive and consider all mitigating evidence. That did not happen in this case. Dixon was sentenced to death after the trial judge excluded as irrelevant certain important mitigating evidence; and the Ohio Supreme Court thereafter held that the trial court’s ruling was error under Ohio statutory law, but harmless error. In my view, the error was clear and harmful.
The Supreme Court has repeated in unqualified language for more than 30 years the foundational rule that the Eighth Amendment requires in death penalty cases the admission of any mitigating evidence “that might serve ‘as a basis for a sentence less than death.’ ” Skipper v. South Carolina, 476 U.S. 1, 5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). Over that period, the Supreme Court has never invoked harmless error or suggested that this relatively simple Eighth Amendment mitiga *1014 tion rule, stated in many cases,[1] should be subject to “harmless error” analysis. The reason for this rule is that a mandatory death penalty that leaves out consideration of mitigation is unconstitutional. Each juror at the mitigation phase of the proceeding must have the discretion to spare the defendant’s life. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).[2] The Lockett line of eases insists that the jurors should make that judgment based on considering all mitigating factors weighed against the aggravating factors. Nevertheless, a recent case in this circuit has assumed without discussion that harmless error analysis applies. Campbell v. Bradshaw, 674 F.3d 578, 596-97 (6th Cir.2012) (no discussion of whether harmless error analysis applies in cases of failure to allow mitigating evidence in capital cases and no consideration of the “death is different” principle that requires mitigating evidence, as explained in Woodson, supra). I will therefore assume that the federal harmless error doctrine is applicable to the Lockett line of cases even though the Supreme Court has never so ruled but rather has treated Lockett as a reversible per se rule.
The mitigating evidence here was the fact that Dixon at age 19 spent 234 nights in jail for crimes he ■ never committed. Dixon faced perhaps the 'rest of his life in prison after he was charged with rape and aggravated burglary in the fall of 1992. However, it wasn’t until nearly 8 months later, when DNA and fingerprint evidence conclusively proved his innocence, that he walked out of jail. Before this incident, Dixon did not have an adult record and had never spent time in an adult facility. Just three months into this wrongful imprisonment term, a psychological evaluation revealed that he suffered from “anxiety and depression,” was experiencing “personal family problems,” and had “doubts about his emotional stability.” (Pet. for Postconviction Relief, Ex. D, Ericson Report, Oct. 21, 1996). He told the psychologist that “he had anger which built up.” Id.
Just four months later, without having undergone any treatment or rehabilitation for this wrongful incarceration, Dixon committed the brutal murder for which Ohio has now condemned him to die. The jury never heard evidence of the psychological trauma of his time in jail. The jury had no context for his statements to detectives *1015 when he told them that he had “no faith in the system anymore.” Dixon Apx. Vol. 2. Pg. 1237. The judge simply determined that this evidence was irrelevant, despite his counsel’s argument that this information might give the jury some understanding of his mental state “because he had suffered a pretty outrageous injustice himself, and he was an angry young man.” Jt. Apx. Pg. 291.[3]
The Ohio Supreme Court found that the exclusion of this mitigating evidence was error under state law for the same reasons that the Woodson case found that its admission was necessary to avoid an unconstitutional, mandatory death penalty law. But the Ohio Supreme Court, without any further explanation, concluded that the error was harmless under state law:
Finally, the trial court’s exclusion of proposed evidence regarding Dixon’s prior incarceration on rape charges was harmless. Defense counsel had intended to introduce evidence that, prior to the murder, Dixon was exonerated after spending several months in jail on rape charges. The trial court should have permitted this evidence to be submitted for the jury’s consideration as a mitigating factor pursuant to R.C. 2929.04(B) because it fits within the “history, character, and background of the offender.” See State v. Stumpf (1987), 32 Ohio St.3d 95, 100-101, 512 N.E.2d 598. See, also, State v. White (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140. Nevertheless, our independent reassessment of the sentence will minimize any prejudicial impact. State v. Lundgren (1995), 73 Ohio St.3d 474, 486, 653 N.E.2d 304, citing State v. Landrum (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710.
State v. Dixon, 101 Ohio St.3d 328, 805 N.E.2d 1042, 1057 (2004). The Ohio Supreme Court did not offer any explanation for its harmless error ruling, but there is a body of psychological and psychiatric literature that makes clear that such exoneration evidence is mitigating and neither “irrelevant” nor weak and insignificant.
A few excerpts from the literature will demonstrate that excluding the evidence from the jury should not be labeled “harmless error.” We cannot know now how much jurors would have been influenced by the exoneration evidence and how the discussion of the death penalty in the jury room would have changed. But certainly no one can confidently predict that it would not have been discussed as a serious basis for sparing Dixon’s life. It should not have been swept under the rug at the trial or on appeal, nor should this violation of the Lockett line of cases be swept under the rug in order to avoid a retrial of the mitigation phase of the case. It is our duty to see that individuals are not executed in the face of uncontested constitutional violations.
Adrian T. Grounds, a British forensic psychiatrist who is senior lecturer at the University of Cambridge, reported his findings in “Understanding the Effect of Wrongful Imprisonment,” 32 Crime & Justice 1, 2, 41-43 (2005). Based on a number of studies, he reports:
*1016 The clinical findings from the psychiatric assessments indicated prevalent and often severe mental health and adjustment problems. After release, most men were described by their families and others as changed in personality and features of post-traumatic stress disorder and additional depressive disorders were common. The men reported persisting difficulties of psychological and social adjustment, particularly in close relationships. They described estrangement, difficulty in restoring intimate and family relationships, and complex experiences of loss ...
It is now recognized that widely differing kinds of trauma can produce a similar set of clinical symptoms. Saporta and van der Kolk (1992) suggest that traumatic events have four common features. First, they seem incomprehensible: they threaten the individual’s basic assumptions about himself and his world. Second, they rupture attachments to others, and subsequent long-term difficulties in forming relationships are common. Third, the traumatic situation is inescapable and overwhelming. Fourth, traumatic events cause extreme physiological arousal leading to a persistent hypervigilance and sense of threat. These features also characterized the experiences described by the wrongly convicted men. The war veteran literature may be particularly illuminating because the forms of stress experienced by combat veterans are also likely to be chronic and may be associated with long periods of separation from families.
There did not appear to be an obvious relationship between duration of custody and severity of outcome. The most distressed and severely psychiatrically disabled men included some who had served the shortest periods and some who had served very long periods. Likewise, previous experience of imprisonment did not obviously appear to protect against adverse outcomes.
Id. Other studies also prove the importance of allowing jurors an opportunity to consider the post-traumatic-type effects of wrongful imprisonment. Delaney, Findley and Sullivan, Exonorees’ Hardships After Freedom, Wisconsin Lawyer, Feb. 2010, at 18:
Imprisonment has powerful effects. Prison rules tend to create a dependence on institutional structures. To survive in prison, some inmates embrace aggression to avoid victimization. Others become isolated and withdrawn, exhibiting behavior resembling clinical depression. Some researchers think incarceration causes a form of post-traumatic stress disorder.
Wrongful incarceration compounds these typical effects of imprisonment in ways that are only beginning to be understood. Anecdotal evidence suggests that wrongfully incarcerated individuals experience rage and institutional mistrust while imprisoned.
Another example in the literature is Scott, Leslie, “It Never, Ever Ends”: The Psychological Impact of Wrongful Conviction, American University Criminal Law Briefs, no. 2, at 10 (2010).
Although exonorees suffer different types of mental illness, and to varying degrees, after spending time in prison for crimes they did not commit, one thing is certain — they all suffer. According to a Michigan study, many exonerated individuals grapple with emotional problems after they have been released, many are angry, and some resort to crime.
Therefore, because the exclusion of the exoneration evidence is clear constitutional error under the Lockett line of cases and *1017 because it seems likely that at least one juror may have found the evidence troubling enough to spare Dixon’s life, I believe the writ should issue and the penalty phase of the case retried. Death is different, and we have a clear duty to see that executions do not go forward in the face of an unexplained, unanalyzed “harmless error” label used as a cover to disregard a longstanding constitutional rule.
Neither this court nor the Supreme Court should permit the taking of life by state execution when there is a blatant violation of the Lockett rule. Both the Ohio courts and this court have turned the rule into a matter of judicial discretion so that there is no longer any pretense that there is any uniformity from state to state in the administration of the death penalty.
On the issue raised by petitioner concerning rehearing by the panel, I adhere to my dissenting opinion arguing that the state court’s exclusion of mitigating evidence regarding petitioner’s wrongful incarceration was unconstitutional. That evidence shows that petitioner was wrongly incarcerated for almost a year for a crime he did not commit. When that mitigating evidence is added to the mitigating evidence that petitioner’s counsel erroneously failed to offer, as carefully described in Judge Cole’s first opinion in this case, Dixon v. Houk, 627 F.3d 553, 559-568 (6th Cir.2010) (Cole, J., concurring), rev’d sub nom., Bobby v. Dixon, — U.S.-, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011), it is clear that his trial jury had no idea about petitioner’s unusually cruel and brutal treatment as a child or his long wrongful incarceration at the hands of the state. Had these mitigating factors come before the jury, one or more jurors might well have spared his life.

. Abdul-Kabir v. Quarterman, 550 U.S. 233, 264-65, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007); Smith v. Texas, 543 U.S. 37, 45-48, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004); Tennard v. Dretke, 542 U.S. 274, 286-88, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004); Penry v. Johnson, 532 U.S. 782, 804, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); Penry v. Lynaugh, 492 U.S. 302, 317, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); Hitchcock v. Dugger, 481 U.S. 393, 398-99, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Skipper v. South Carolina, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 110-12, 102 5.Ct. 869, 71 L.Ed.2d 1 (1982); Bell v. Ohio, 438 U.S. 637, 642, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978).

. The Court in Woodson explained the mitigation requirement as follows: "In Furman, members of the Court acknowledge what cannot fairly be denied that death is a punishment different from all other sanctions in kind rather than degree. A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." Woodson, 428 U.S. at 303-04, 96 S.Ct. 2978 (internal citations omitted).

. At the trial Dixon's lawyer argued to the trial judge:
MR. GEUDTNER: We believe it’s a (B)(7) [statutory] factor, and, quite frankly, we're going to argue that the jury can infer from that experience the defendant in the months following his release was a rather embittered and enraged young man.
THE COURT: Based upon the arguments of counsel and the review of Section 2929.04(B) of the Ohio Revised Code, the Court finds that the proposed evidence suggested by the defense is not relevant to any of the mitigating factors and will not permit you to put that in.
(Tr. 932-33)