GREGORY, Circuit Judge,
dissenting:
Today the majority blesses with constitutional imprimatur a death sentence that could only have been imposed after the jury found that Carlos Caro had previously been convicted of relatively minor, nonviolent drug offenses. If his sentence is ultimately carried out, Caro might well be the first, and as yet only, defendant executed after a jury found him death-eligible solely due to this type of nonviolent conduct. To reach this result, the majority applies the wrong test for deciding whether eligibility factors sufficiently narrow the class of defendants who can be executed and renders an important step in capital jurisprudence virtually useless. In doing so, my colleagues uphold statutory provisions that distinguish those who live from those who die in a wholly arbitrary and capricious way. I respectfully dissent.[1]
I.
At the outset, it is important to be clear about what conduct the eligibility factors in 18 U.S.C. §§ 3592(c)(10) and (12) cover and how those subsections apply to Caro. Subsection ten provides that a convicted murderer is eligible for death if that defendant “has previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.” § 3592(c)(10). Subsection twelve makes a convicted murderer death-eligible if “[t]he defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed.” § 3592(c)(12). Titles II and III, as amended, prescribe fíve-or-more years in prison for, among other things, simple possession of “a mixture or substance which contains cocaine base,” 21 U.S.C. § 844(a), and distribution of controlled substances, including possession with intent to distribute, § 841.
It is clear from the statute’s structure that Congress intended to target relatively minor drug offenders for death-eligibility, and not simply the worst of the worst. Congress could have crafted eligibility factors that covered the worst offenders— those, for example, who operate through violence and intimidation, drug kingpins, and those who target children and schools — in fact, Congress did so in other parts of the FDPA. See 18 U.S.C. § 3591(b)(1) (authorizing death for a defendant who was part of a “continuing criminal enterprise” to distribute drugs), § 3591(b)(2) (authorizing death for the leader of a drug conspiracy who kills or attempts to kill a public officer, juror, or witness to further the conspiracy), § 3592(e)(13) (authorizing death for murder defendants who were part of a continuing enterprise to distribute drugs to minors). But in subsections ten and twelve, *637 Congress opted to target offenders at the bottom of the drug-offender ladder: individuals convicted of crimes carrying prison sentences as low as one year; street-level distributors, drug mules, and even some possessors.
Caro was precisely this kind of low-level, nonviolent offender. He was a drug mule, recruited by his father and uncles at a young age to smuggle drugs across the border from Mexico, who in the process was twice convicted of possession with intent to distribute marijuana and once of possession with intent to distribute cocaine. Caro was by no means a high-ranking member of a drug conspiracy and by all accounts was never violent before going to prison. Under the FDPA, however, Caro’s drug history is sufficient to make him eligible for death in the absence of any other aggravating factor relating to his character or crime. This is unacceptable under the Eighth Amendment and the majority is wrong to find otherwise.
II.
The majority first errs by fundamentally misconstruing the nature and purpose of statutory eligibility factors in the death penalty schema. It claims that eligibility factors are constitutional so long as they do not apply to every murder defendant and so long as they are supported by some conceivable legislative goal. Maj. Op. at 623-24. By substituting rational basis review for the appropriate Eighth Amendment analysis, the majority glosses over the very serious way in which the eligibility factors challenged by Caro fail to narrow the class of death-eligible offenders in the way required by the Constitution.
Under the Eighth Amendment, only the government’s interest in deterring and punishing violence implicates its interest in imposing the death penalty. Consequently, to perform their constitutionally required narrowing function, eligibility factors must limit the jury’s focus to the defendant’s violent conduct. Because the factors challenged here plainly do not do so, they cannot be the basis for Caro’s death sentence.
A.
By now it is axiomatic in capital jurisprudence that “where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.” Godfrey v. Georgia, 446 U.S. 420, 427-28, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality) (quoting Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). Statutory eligibility factors “play a constitutionally necessary function” in this process by “circumscribing] the class of persons eligible for the death penalty.” Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
In order for eligibility factors to serve this constitutional function, they must “adequately differentiate ... in an objective, even-handed, and substantively rational way” those whom a jury may consider for death and those whom it may not. Id. at 879, 103 S.Ct. 2733; see Arave v. Creech, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) (aggravating factors must distinguish defendant sentenced to death from others convicted of murder in a “principled” way); Lowenfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (eligibility factors are “a means of genuinely narrowing the class of death-eligible persons”); Godfrey, 446 U.S. at 433, 100 S.Ct. 1759 (invalidating death sentence based upon eligibility factor where “[t]here is no principled way to *638 distinguish this case, in which the death penalty was imposed, from the many cases in which it was not”).
The Supreme Court has helped illustrate the narrowing process, and statutory eligibility factors’ role within it, by describing it as a pyramid. See Zant, 462 U.S. at 870-71, 103 S.Ct. 2733; Walton v. Arizona, 497 U.S. 639, 716-18, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Stevens, J., dissenting). At the first point above the base of this pyramid lies the specific category of crimes for which the legislature, and subsequently the jury, may prescribe death. Zant, 462 U.S. at 871, 103 S.Ct. 2733. As the law stands today, this category is limited to murder or other crimes that result in the death of the victim. Kennedy v. Louisiana,—U.S.-, 128 S.Ct. 2641, 2665, 171 L.Ed.2d 525 (2008) (“Difficulties in administering the penalty to ensure against its arbitrary and capricious application require adherence to a rule reserving its use ... for crimes that take the life of the victim.”). At the pyramid’s apex is the particular crime for which a jury ultimately sentences a defendant to die. Zant, 462 U.S. at 871, 103 S.Ct. 2733. In order to move from the base to the apex, however, a defendant must pass through the eligibility plane.
In that eligibility plane, a jury must decide whether legislatively prescribed factors exist that separate murderers generally from death-eligible murderers. Id. Importantly, where a jury convicts a defendant of murder but does not convict him of special circumstances or aggravating factors in conjunction with that murder, then that defendant does not move from the base to the apex and therefore cannot be constitutionally executed. Id. at 878, 103 S.Ct. 2733 (aggravating factors, which move the defendant from the base to the second plane, are “constitutionally necessary”); see Arave, 507 U.S. at 474, 113 S.Ct. 1534 (aggravating factors are constitutionally infirm if they apply “to every defendant eligible for the death penalty” (emphasis in original)).
B.
Properly framed, the question raised by Caro’s appeal is whether the two aggravating factors found by the jury are constitutionally sufficient to move him from the base to the apex, or whether the aggravators so fail to distinguish him from other defendants that they are not constitutionally significant. See Zant, 462 U.S. at 879, 103 S.Ct. 2733. The factors here fail to sufficiently distinguish Caro from the general offender population because they do not involve violence.
A review of Supreme Court jurisprudence illustrates why only the nature or extent of a defendant’s violent conduct can be a basis for moving him up the death penalty pyramid. We know, for instance, that because the death penalty is a punishment different in-kind in its severity and finality from other punishments, it is warranted only to the extent that it punishes conduct that is itself fundamentally distinct from other crimes — hence the aphorism “death is different.” Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Gregg, 428 U.S. at 187, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.); Furman v. Georgia, 408 U.S. 238, 287-88, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Brennan, J., concurring), 306 (Stewart, J., concurring) (1972). How the death penalty is imposed must be tailored to the unique penological goals that justify the state’s extraordinary power to take human life in the fust instance.
When the state renounces a defendant’s humanity by putting him to death, Furman, 408 U.S. at 306, 92 S.Ct. 2726 (Stewart, J., concurring), it does so only to deter potential defendants from renouncing that *639 humanity in others and to express appropriate moral outrage at the disrespect the condemned defendant has shown towards human life by extinguishing it, e.g., Kennedy, 128 S.Ct. at 2661-62; Gregg, 428 U.S. at 183, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.). Only violence — specifically that which results in another’s death — implicates the state’s interest in imposing capital punishment in the first instance. Kennedy, 128 S.Ct. at 2661-62. It follows that if the state’s interest in imposing death is implicated initially by violence, then the constitutionally required narrowing function used to select the most deserving to receive that sentence must focus on the relative severity of that violent crime or past conduct. In other words, for the state’s interest to be sufficient to impose death — to move from the base at which the interest is first implicated to the apex where the interest is sufficiently acute' — the condemned’s conduct must be sufficiently aggravated by concurrent or past violence. Eligibility factors must focus on this interest in order to narrow the jury’s discretion in a genuine and “substantively rational way.” Zant, 462 U.S. at 879, 103 S.Ct. 2733.
This is clear when considering those aggravators that distinguish offenders by the nature of their specific offense, as opposed to the factors here that focus on the defendant’s past conduct or behavior. The former must show that the defendant used violence in a particularly horrible way that is not typical even to murder. See id. at 877; Godfrey, 446 U.S. at 433, 100 S.Ct. 1759. The resulting eligibility factors distinguish murderers based on whether their violent acts were committed for particularly abhorrent reasons, e.g., § 3592(c)(8) (murder committed for pecuniary gain), whether those acts were committed in a particularly horrible way, e.g., § 3592(c)(6) (“especially heinous, cruel, or depraved” conduct), § 3592(c)(5) (grave risk of danger to multiple victims), or whether those acts targeted individuals who deserve added protection from violence, e.g., § 3592(c)(11) (vulnerable victims), § 3592(c)(14)(D) (law enforcement officials and police officers). Each of these categories distinguish defendants on the basis of their violent conduct, and not external factors — like whether the defendant unrelatedly had a bag of cocaine in his car at the time of the murder or whether the defendant was contemporaneously delinquent in filing his tax returns — that have no bearing on the defendant’s culpability for capital punishment purposes.
The same logic applies to aggravators that distinguish death-eligible defendants based on their prior conduct. Prior-conduct eligibility factors must show that a murder defendant is more violent than other murder defendants in order to justify imposing death on that defendant. Otherwise, that eligibility cannot be said to distinguish defendants in a “substantively rational” way. Zant, 462 U.S. at 879, 103 S.Ct. 2733.
This rule is most consistent with how the states and federal government generally use prior-conduct factors to distinguish defendants. The most common prior-conduct aggravators in death penalty statutes are prior convictions for murder or other violent felonies.[2] Indeed, the other aggravators in the FDPA that relate to a defendant’s history and character all involve prior convictions for violent crimes. 18 U.S.C. § 3592(c)(2) (prior conviction for violent felony involving a firearm), (3) (pri- or conviction for crime that resulted in death of another person), (4) (prior conviction of serious offense resulting in death or *640 serious bodily injury). Except when it comes to drug offenses, the states and federal government agree that prior, nonviolent conduct is insufficient to make a murder defendant death-eligible. It is this rule, not its exception embraced by the majority today, which comports with the Eighth Amendment.
C.
Rather than revamp the entire capital-sentencing structure developed by the Supreme Court over the last four decades, I would find that Caro’s death sentence violates the Eighth Amendment because the eligibility factors under which the jury sentenced him fail to narrow the class of offenders eligible for death in a “principled” or “substantively rational” way. See Arme, 507 U.S. at 474, 113 S.Ct. 1534; Zant, 462 U.S. at 879, 103 S.Ct. 2733. Caro was a low-level drug mule, convicted of possession with intent to distribute marijuana and cocaine. These convictions do not distinguish him from other murderers in a constitutionally-significant way because they do not implicate the state’s qualitatively different interest in taking human life to deter future violence or impose retribution for escalating violence resulting in murder. See Kennedy, 128 S.Ct. at 2661-62; Gregg, 428 U.S. at 183, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.). The government’s interest in punishing minor drug offenders is different in-kind from its interest in punishing the most violent and heinous murderers and therefore does not usefully distinguish Caro from other murderers. The same would be true were Caro or any other defendant made death-eligible for tax evasion, wire fraud, or driving while under the influence; none of this prior, nonviolent conduct would implicate the government’s interest in the death penalty and therefore would not constitutionally narrow the class of death-eligible offenders.
The majority disagrees. Instead of holding that any eligibility factor relating to a defendant’s history or prior conduct must involve violence, the majority subjects the factors at issue here to rational basis review. Maj. Op. at 623-24. But rational basis scrutiny has no bearing on whether or not a statutory provision complies with the Eighth Amendment. As the Supreme Court recently explained:
[R]ational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws. In those cases, “rational basis” is not just the standard of scrutiny, but the very substance of the constitutional guarantee. Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.
District of Columbia v. Heller,—U.S.-, 128 S.Ct. 2783, 2818 n. 27, 171 L.Ed.2d 637 (2008) (internal citations omitted). Rational basis, therefore, cannot be used to evaluate whether a statutory provision complies with the specific proscription against cruel and unusual punishment.[3]
*641 In holding otherwise, the majority effectively avoids the Eighth Amendment problem by pretending that Eighth Amendment standards do not apply. Rather than require the government to show that the FDPA suitably narrows a jury’s discretion in a way that advances capital punishment’s legitimate goals, the majority demands that Caro rebut every reason for these eligibility factors that is conceivably related to a legislative goal, no matter how attenuated from the limited interests that justify the state’s executing a human being. The majority recognizes the Eighth Amendment requirement that eligibility factors genuinely and substantively narrow death-eligible defendants, but it robs this requirement of meaning by declaring that any factor is sufficient so long as there is some plausible legislative consideration behind it. This renders the Eighth Amendment rhetoric without content.[4]
In practice, the rule proposed by the majority today transforms the pyramid created by the Supreme Court into a rhombus, in which eligibility factors serve no narrowing function whatever. Though it concedes that the eligibility factors here do not involve violence, the majority insists that they survive its limited, deferential review because drug offenses are “associated with violence.” Maj. Op. at 624. It is hardly clear what it means to be associated with violence, but whatever it does mean, the associated-with-violence test cannot be a genuinely narrowing construct in practice. Among the many factors considered by those in the psychiatric and public-health fields to be “associated with violence” are: fire-setting, truancy, family conflict, recent humiliation, history of bullying or being bullied, poverty, unstructured time, and community disorganization.[5] How can the majority reasonably *642 argue that any of the above factors could serve as statutory eligibility factors? If the majority admits, which it must, that eligibility factors must perform at least some narrowing function, surely its assoeiated-with-violence test must fail.
Likewise, the majority claims that the eligibility factors before us today are justified by the government’s interest in punishing recidivists. Who could doubt, the majority asks, that Congress could reasonably decide that repeat offenders deserve harsher treatment than first-timers? Maj. Op. at 623-24. This very question, though, conflates the government’s general interest in deterring socially detrimental conduct with its interest in deterring death-eligible conduct. Recidivism in the abstract of course justifies escalating punishment. But the “death is different” principle underlying all capital jurisprudence illustrates that conduct must be different in kind, not just degree in order to trigger the government’s interest in putting a defendant to death. See, e.g., Lockett, 438 U.S. at 604, 98 S.Ct. 2954. This is precisely why we are charged with analyzing death penalty claims under the Eighth Amendment and not generalized rational basis review. Nonviolent drug recidivists, like all other nonviolent, repeat offenders do not meet that Eighth Amendment criterion.
III.
Because the majority applies a test that in no way narrows the class of death-eligible offenders, the result is a sentence reached without properly distinguishing Caro from all other murderers. But of all the non-violent offenses the government could have chosen to distinguish death-eligible defendants, drug offenses create perhaps the greatest risk that a defendant will be executed arbitrarily.
A.
It has long been settled that a death penalty provision that applies to a vast offender population but is applied inconsistently or sparingly violates the proscription against cruel and unusual punishment. E.g., Godfrey, 446 U.S. at 433, 100 S.Ct. 1759 (plurality); Furman, 408 U.S. at 249, 92 S.Ct. 2726 (Douglas, J., concurring), 276 (Brennan, J., concurring), 309 (Stewart, J., concurring), 312 (White, J., concurring), 366 (Marshall, J., concurring). This is so largely because when the government selects so few offenders from such a large pool for execution, it cannot further its legitimate penological interests; instead it merely inflicts gratuitous pain and suffering. See Gregg, 428 U.S. at 183, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.); see also Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 1551, 170 L.Ed.2d 420 (2008) (Stevens, J., concurring).
According to a Department of Justice report, 54 percent of federal inmates in 2007 were in prison for nonviolent drug offenses[6] — by far the highest percentage *643 of offenders in any category.[7] That same report also found that nearly 20 percent of inmates in state prison were also there for drug crimes,[8] of which 60 percent were low-level and nonviolent.[9]
Of all the nonviolent offenses Congress could have made death eligible, it is clear, then, that it targeted the class of offenses with the largest number of offenders. And when these reports are viewed in conjunction with the 8.6 million people who reported using crack cocaine as of 2007,[10] and the number of persons convicted of applicable drug offenses who are no longer in prison, the eligibility factors used to make Caro death-eligible potentially apply to several million people. This makes subsections ten and twelve functionally catchall provisions, which a prosecutor can choose to use or not use arbitrarily and in a way that leads to “standardless sentencing discretion.” See Godfrey, 446 U.S. at 428, 100 S.Ct. 1759 (internal quotation marks and alterations omitted).
Even if they could theoretically be applied reasonably, courts and juries use the factors so rarely that they gravely risk doing so arbitrarily in practice. The government cites to one case in which an appellate court previously upheld a death sentence under subsection (c)(10). See United States v. Bolden, 545 F.3d 609, 617 (8th Cir.2008). I am aware of only one other case in which a defendant was sentenced to die after a jury found him death-eligible under the provisions challenged by Caro. See United States v. Higgs, 353 F.3d 281, 295 (4th Cir.2003). In both Bolden and Higgs, however, the jury also found that the defendants were eligible under other provisions, and not just because of prior nonviolent drug offenses. That, to the best of my knowledge, makes Caro the only defendant who was deemed death eligible only under one or both of these FDPA provisions.
The result is the same when considering any analogous state law provisions. By my count, only two states, Louisiana and New Hampshire, have provisions that arguably apply as broadly as the FDPA’s;[11] yet I am aware of no case in which either of those states’ courts considered a death sentence for an offender who was selected for death eligibility because of a prior nonviolent drug conviction.
The government, therefore, cannot claim that executing Caro will further its legitimate interests in deterrence or retribution. See Kennedy, 128 S.Ct. at 2649-50. Low- *644 level drug offenders are so rarely selected for death and ultimately executed for their prior offenses alone that the FDPA cannot be said to deter them from murder. See Furman, 408 U.S. at 311, 92 S.Ct. 2726 (White, J., concurring). Likewise, murderers are so infrequently and inconsistently selected to die on the bases asserted here that it is “very doubtful that any existing general need for retribution would be measurably satisfied” by Caro’s execution. Id. Executing Caro would therefore be “the pointless and needless execution of life with only marginal contributions to any discernible social or public purposes.” Id. It would consequently be irreconcilable with the Eighth Amendment.
B.
The inherent arbitrariness in subsections ten and twelve is exacerbated by the way in which they can work to prevent a jury from giving meaningful consideration to relevant, mitigating evidence. Our justice system, reflecting broader concerns of society at-large, takes an often ambivalent view of minor drug offenders; one that recognizes their criminality but simultaneously accepts their own victimhood. Because drug offenses can so often be part- and-parcel of otherwise mitigating circumstances, making these offenses eligibility factors limits a defendant’s ability to present mitigating evidence and increases the likelihood of an arbitrary sentence.
Not only must a capital defendant be allowed to present mitigating evidence at his sentencing, but the jury must be able to give meaningful effect to that evidence. Abdul-Kabir v. Quarterman, 550 U.S. 233, 262, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007); Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), overruled on other grounds, Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Courts must closely scrutinize evidence that can be used as a “two-edged sword” against a capital defendant, i.e., mitigating evidence that a jury might also consider aggravating, to ensure that juries can give appropriately mitigating weight to that evidence. Abdul-Kabir, 550 U.S. at 255, 127 S.Ct. 1654; Roper v. Simmons, 543 U.S. 551, 573, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (abolishing death penalty for juveniles, in part because juries might inappropriately consider youth an aggravating, rather than a mitigating factor); Atkins, 536 U.S. at 320, 122 S.Ct. 2242 (creating a bright-line rule barring execution of mentally retarded, in part because of the risk that juries would consider evidence of mental retardation aggravating, not mitigating).
A defendant’s history of drug abuse is classic mitigating evidence, which the Supreme Court has held a jury must be able to consider and give effect to when sentencing a defendant. E.g., Cone v. Bell,-U.S.-, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009). Likewise, evidence that a defendant was induced into criminal behavior at a young age by close relatives is precisely the type of “troubled childhood” evidence to which jurors must be allowed to give meaningful, mitigating effect. See Abdul-Kabir, 550 U.S. at 262, 127 S.Ct. 1654. Indeed, the FDPA itself acknowledges specifically that juveniles induced into drug trafficking by adults are victims who are presumably less blameworthy for their conduct. See § 3592(d)(7) (making it an aggravating factor to use minors in drug trafficking).
Jurors in Caro’s case could not be expected to give meaningful effect to Caro’s drug use and troubled background because they were forced to consider both as the reasons he should be death-eligible in the first place. The record reveals that Caro *645 was a cocaine addict[12] and that he dropped out of school to become a drug mule at his father and uncles’ behest. Caro’s attorneys were therefore faced with a modern Sophie’s Choice: either forcefully present this evidence, thereby emphasizing to the jurors the basis for which they selected Caro for death-eligibility, or hardly mention the evidence at all to avoid further aggravating Caro’s crime in the jurors’ eyes.
It is rare, indeed, that an attorney’s decision not to present or emphasize mitigating evidence can truly be characterized as a strategic choice. But here it is not surprising that Caro’s lawyers opted to focus on Caro’s future dangerousness to the jury, rather than his drug addiction or his early introduction to drug smuggling by his father and uncles. Even if his lawyers had emphasized it, at best, the jury could not be expected to give any meaningful effect to the same evidence that aggravated Caro’s crime to death-eligible murder. At worst the evidence would have only reinforced their initial finding that Caro was worthy of the ultimate punishment. Caro’s sentence quite possibly was “imposed in spite of factors which may [have] eall[ed] for a less severe penalty,” Lockett, 438 U.S. at 605, 98 S.Ct. 2954, because the FDPA prevented the jury from considering relevant, mitigating evidence. The risk that the resulting sentence was imposed arbitrarily “is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.” Id.
IV.
Today’s decision comes on the heels of an interesting report regarding the state of capital punishment in this country, and particularly in our circuit. According to the report, the number of death sentences handed down nationally over the past year has decreased to the lowest level since the Supreme Court reinstated capital punishment in 1976.[13] This is particularly true in Virginia, which traditionally uses the death penalty more than all-but-one other state in the union.[14]
Among the reasons suggested for this phenomenon are the response to recent Supreme Court decisions prohibiting executions for certain offender classes, jurors’ concerns about executing innocent people, and legislative and prosecutorial concerns about overusing the death penalty in the current economic climate.[15] Ironically, one of the reasons given for the reduction of death sentences in Virginia is that prosecutors are increasingly not seeking death for drug-related murders — apparently because they do not view these offenders as the worst of the worst.[16] This reduction in prosecutors’ pursuing death sentences and juries’ imposing them has not correlated with a similar reduction in executions, nor has it hampered the states’ ability to execute the most heinous offenders.[17]
All of which suggests that the decades-long dialogue between courts and the political branches about capital punishment is finally starting to achieve a constitutionally-neeessary equilibrium; one that accom *646 modates the government’s interest in punishing murderers and the Constitution’s command that the government not do so arbitrarily. As the judiciary has tried to implement the Eighth Amendment’s proscription against cruel and unusual punishment by requiring that death sentences be imposed only after a process that selects, in a non-arbitrary way, the worst-of-the-worst offenders, the political branches have responded by recalibrating their notion of which offenders are death eligible and proceeding accordingly. The apparent upshot is that those charged with the awesome power of seeking and imposing death have sought to limit that power to those most deserving, and in so doing, have made the death penalty more effective and efficient, even as they have limited the class of offenders to whom it may be applied.[18]
This decision threatens to undermine that constitutionally necessary equilibrium. Carlos Caro’s death sentence was imposed because he had previously committed relatively minor, nonviolent drug crimes. Of all similarly situated defendants, it appears that only Caro now faces the prospect of being executed after being chosen because of factors so completely divorced from the state’s legitimate penological interests in taking human life. Whatever Caro’s prior conduct says about his character, under the Eighth Amendment, it cannot serve as the sole reason for his death eligibility as compared to other defendants. Even the government’s attorney had to allow at oral argument that Caro’s sentence seemed “anachronistic” in light of evolving death penalty jurisprudence. Yet the majority disagrees.
Justice Stewart spoke in Furman of the way in which some “death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.” 408 U.S. at 309, 92 S.Ct. 2726 (Stewart, J., concurring). Thirty-eight years later, I can think of no more apt way to describe Caro’s sentence. The FDPA provisions that prescribe such a random and unprincipled sentence do not withstand Eighth Amendment scrutiny. Had the majority applied that level of scrutiny, I have little doubt that it would have reached the same conclusion. I respectfully dissent.

. My dissent is limited to the judgment and the majority's holding in Part IV that the eligibility factors in this case pass Eighth Amendment scrutiny. I concur with the rest of the Court’s analysis.

. See The Death Penalty Information Center, Aggravating Factors for Capital Punishment by State (2009), http://www.deathpenaltyinfo.org/ aggravating-factors-capital-punishment-state.

. The majority apparently confuses the Eighth Amendment's requirement to review death sentences for arbitrariness with rational basis review. Maj. Op. at 624. This is a clear mistake.
Rational basis is a term of art; a method by which courts review almost all state action to ensure that there is at least some conceivable, non-discriminatory or rational purpose for that action. See United States v. Carotene Products Co., 304 U.S. 144, 152-53, 58 S.Ct. *641 778, 82 L.Ed. 1234 (1938). The Eighth Amendment's arbitrary-and-capricious review is quite different. When reviewing a death sentence under the Eighth Amendment, a court looks to whether the sentence was imposed under conditions that create a substantial risk that the decision to execute a defendant was reached arbitrarily and capriciously. Gregg, 428 U.S. at 189, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.). Essentially, rational basis review is the opposite of arbitrary-and-capricious review. The former assumes that the government is acting appropriately and will accept almost any explanation to support that assumption. See Carotene Products, 304 U.S. at 153, 58 S.Ct. 778. The latter places the burden on the state to show that where it decides to take a human being’s life, it has reached that decision in the most scrupulous and principled way possible. See Kennedy, 128 S.Ct. at 2665 ("In most cases justice is not better served by terminating the life of the perpetrator rather than confining him”); Gregg, 428 U.S. at 189, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.).

. The majority’s unabashed embrace of this position is startling. It admits, as it must, that in order to comply with the Eighth Amendment, statutory aggravating factors must "genuinely narrow the class of persons eligible for the death penalty,” but in the same paragraph chastises me for "presupposing] that each statutory aggravating factor standing alone must narrow the class of persons eligible for the death penalty to include only those who deserve a death sentence.” Maj. Op. at 624 n. 16 (internal citations and quotation marks omitted). The logical inconsistency in this statement is obvious. If the Supreme Court says that aggravating factors must genuinely narrow the class of offenders eligible for the death penalty, it is hardly a great presupposition to conclude that the factors, themselves, must narrow in accordance with the Eighth Amendment. The majority can insist all it wants that the aggravating factors here "plainly” satisfy the ad hoc standard it invents today, but it cannot pretend that its standard is derived from the Eighth Amendment or flows from the decisions of the Supreme Court.

. New York State Office of Mental Health, Violence Prevention: Risk Factors, http://www. omh.state.ny.us/omhweb/sv/risk.htm. See Erica Beecher-Monas & Edgar Garcia-Rill, Dan *642 ger at the Edge of Chaos: Predicting Violent Behavior in a Post-Daubert World, 24 Cardozo L.Rev. 1845, 1867-68 (2003) (listing mental illness, family dysfunction, poverty, and living in high crime or urban areas as potential risk factors for violence and then explaining that the presence of a risk factor does little to predict whether or not an individual with that risk factor will actually be violent in the future).

. The Report does not explicitly state that the drug offenders are nonviolent; however, the report does distinguish miscellaneous, violent offenders from drug offenders and organizes the statistics by most serious offenses, illustrating that the drug offenders were veiy likely nonviolent.

. Heather C. West & William J. Sabol, Prisoners in 2007 App. 12 (2008), available at http:// www.ojp.usdoj.gov/bjs/pub/pdi/p07.pdf.

. Id. at App. 11.

. Marc Mauer & Ryan S. King, A 25 Year Quagmire: The War on Drugs and its Impact on American Society 2 (2007), available at http://www.sentencingproject.org/doc/ publications/dp_25yearquagmire.pdf.

. National Institute of Drug Abuse, NIDA InfoFacts: Crack and Cocaine 4 (2009), http:// www.drugabuse.gov/pdf/infofacts/Cocaine09. pdf.

. N.H.Rev.Stat. Ann. § 630:1 (2009); La. Code Crim. Proc. Ann. art. 905.4(A)(11) (2009). The one case of which I am aware in which the Louisiana Supreme Court interpreted its provision, it did so only in the context of a capital defendant who killed during the course of a drug deal and not a defendant who was made death-eligible for a past offense. See Louisiana v. Neal, 796 So.2d 649, 661 (La.2001).
Furthermore, Florida authorizes a defendant’s prior drug conviction, carrying a sentence of more than one year, to be used as a statutory aggravator, but only if the defendant's underlying capital conviction was for drug trafficking. Fla. Stat. Ann. § 921.142(6)(b) (LexisNexis 2009). This provision is almost surely unconstitutional in light of the Supreme Court's decision in Kennedy. See 128 S.Ct. at 2665.

. It does not appear in the record whether Caro was addicted to cocaine powder or cocaine base.

. Robert Barnes & Maria Glod, Number of Death Sentences Falls to a Historic Low, Wash. Post, Dec. 18, 2009, available at http:// www.washingtonpost.com/wp-dyn/content/ article/2009/12/17/ AR2009121704299.html.

. Id.

. Id.

. Id.

. See id.

. Despite the dramatic reduction in death sentences in Virginia, the last person executed in the Commonwealth was put to death within six years of his sentence and conviction. Josh White & Maria Glod, Muhammad Executed for Sniper Killing, Wash. Post, Nov. 11, 2009, available at http://www.washingtonpost. com/wp-dyn/content/article/2009/11/10/ AR 2009111001396.html. Conversely, since the Supreme Court reinstated capital punishment, the average condemned inmate has spent over a decade on death row before the sentence has been implemented. See The Death Penalty Information Center, Time on Death Row, http://www.deathpenaltyinfo.org/ time-death-row.