# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 4, 2020

Lyle W. Cayce
Clerk

No. 19-70015

PETE RUSSELL,

*Petitioner—Appellant*,

*versus*

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC Case. No. 4:13-CV-3636

Before GRAVES, WILLETT, and ENGELHARDT, *Circuit Judges*.

JAMES E. GRAVES, JR., *Circuit Judge*:\*

Pete Russell was convicted of capital murder and sentenced to death in Harris County, Texas for the 2001 killing of Tanjala Brewer. He seeks a certificate of appealability (COA) from the district court's denial of his petition for writ of habeas corpus. Because reasonable jurists would neither

---

\* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

find that the district court's assessment of the constitutional claims was debatable or wrong nor that the district court erred in its procedural rulings, we deny the application.

## FACTS AND PROCEDURAL HISTORY

Tanjala Brewer was a paid confidential informant for the Houston Police Department under narcotics officer D.K. Bush. Brewer and Pete Russell[1] dated for about a year-and-a-half. After the romantic relationship between Russell and Brewer ended, she took an undercover officer, Bush, to Russell's house and introduced him to Russell as her nephew.[1] Believing Brewer, Russell agreed to sell the undercover officer several ounces of crack cocaine. After the transaction, Russell was arrested. On August 9, 2001, Russell pleaded guilty to delivery of a controlled substance and received a ten-year sentence. However, Russell successfully requested that the court delay the date for execution of his sentence until September 7.

Around 11 p.m. on August 12, Brewer's neighbor saw Brewer and Russell walking down the street together near Brewer's house. About 1 a.m., the neighbor heard Brewer's screen-door close and saw Russell walking and then running down Brewer's driveway toward the street.

Before noon on August 13, 2001, family members discovered Brewer's body lying on her kitchen floor. Brewer's throat had been slit and she had been stabbed multiple times with a kitchen knife. There was also evidence of asphyxiation and shoe imprints indicating someone had stomped on her legs and stomach. Bloody drag marks indicated she had been dragged from her bedroom to the kitchen, where she was posed in a spread-eagle position with her skirt raised and a crack pipe in her hand. Someone had written on a

---

[1] Bush said Brewer received $240 for setting Russell up.

2

mirror and wall with blood. Natural gas valves were turned on in the home and candles were left burning. The toxicology report pursuant to Brewer's autopsy revealed the presence of a significant amount of cocaine in her system.

Based on the neighbor's account and evidence at the scene, Russell became a suspect. Authorities located Russell a few days later, sitting in a motel room bathtub, fully clothed and foaming at the mouth from ingesting poison in an apparent suicide attempt. Russell was taken to the hospital and his stomach was pumped. Authorities discovered a diamond ring in Russell's pocket.

Russell subsequently gave two recorded statements, one at the hospital and one at the jail the following day, admitting guilt. The recordings were introduced at trial and transcripts were provided for reference. The preceding facts are largely undisputed. Russell admits that he killed Brewer. However, he disputes why he killed her. This goes to whether he committed capital murder. Here, that is murder in the course of committing or attempting to commit another crime, i.e., retaliation, under Texas law.

During Russell's first recorded statement at the hospital, Houston Police Department Sergeant Hal Kennedy asked him, "[i]n your own words tell me what happened and why you did what you did." Russell replied that, "[Brewer]. . . She set—she set me up—she set me up with the police." When asked how Brewer set him up, Russell said:

> She brought an undercover to my house saying it was her nephew that her nephew wanted to buy some drugs . . . and about fifteen or thirty minutes later her nephew which is the undercover, call me and I met him up there at Family Dollar – McDonald's and that's when I got busted.

Russell later said, "[a]nd then you know what I'm saying we broke up and that's when she set me up with the laws." *Id.* When Kennedy asked how it is that Brewer got killed, Russell responded:

> Basically, ah I went over her house and you know since she let me in and she was smoking some drugs whatever and you know we were just talking whatever you know about the things we used to do and I was basically asking her "Why did you set me up?" "Why did you set me up?" and she kept on denying it talking bout "I ain't set you up." "I ain't set you up." Saying "if you would have stayed with me none of this would have happened" whatever. And, basically, you know what I'm saying I just . . . I just went off. I just snapped.

Russell also stated:

> It just . . . It just happened all the while she was smokin' you know what I'm saying and the last thing she said, "If you would have stayed with me it would have never happened." And the next thing I know I just snapped like that you know there was a knife on the lit dresser right there and I just grabbed it and jumped on her right there.

Officers went to the jail the following day to take photographs of a cut on Russell's hand and he gave a second recorded statement. During that second statement, Russell said that he did not mean to kill Brewer and that "I really like to say though that I'm sorry and that I really loved [Brewer] and if ah I could do it all over again, it wouldn't have happened." When asked if he just lost his temper, Brewer replied:

> Yes sir, I just snapped and like a say I loved her, I loved the family you know that I'm saying, the son and everything and if I had the chance to do it over again, I wouldn't have done it. I want her family to know that I'm sorry and her friends you know that I'm sorry and that ah I would always love her and everything.

4

No. 19-70015

The state charged Russell with capital murder in the course of committing or attempting to commit retaliation based on Brewer informing the police of Russell's drug dealing. *See* Tex. Penal Code § 19.03(a)(2); *see also* Tex. Penal Code § 36.06(a). Russell went to trial in 2003, and multiple witnesses testified.

Andre Wilson lived across the street from Brewer and knew both Brewer and Russell. Wilson also knew that Russell was jealous over Brewer. The evening before Brewer was murdered, Wilson said he saw Brewer and Russell walking down the street together away from Brewer's house. Wilson said Brewer acted normal and asked him for a cigarette. Wilson also testified that he thought Russell and Brewer were still dating at the time. Some hours later, around 11 p.m., Wilson saw Russell and Brewer walking back toward Brewer's house. At approximately 1 a.m., Wilson was on the porch at his grandmother's house, which was next door to Brewer's, and heard a screen door slam. Wilson then saw Russell walking and then running away from Brewer's house.

At the time of her death, Brewer was also involved in a relationship with Wilbert Reed, Jr. Reed said he last saw Brewer alive at approximately 12:15 a.m. on August 13, 2001. Reed said he had talked to Brewer on the telephone and she wanted him to come by to see her and drop her off some money before he went to work driving a truck. Reed went by Brewer's house around 11:30 p.m. and testified that Brewer was happy and in a very good mood during the forty-five minutes he was there. Upon leaving Brewer's house, Reed said he called Brewer on his cell phone and they talked a few different times. When Reed called Brewer back between 12:45 and 1 a.m., he received a busy signal. Reed said he attempted to call Brewer multiple times throughout the remainder of the night but kept getting a busy signal and never talked to her again.

Reed testified that he and Brewer had plans for him to pick her up when he got off work. After Reed got off work, he went by Brewer's house a couple of times, but nobody answered the door. Reed said that he was angry, so, he wrote a note and slid it under the door. In the note, Reed essentially accused Brewer of using him and stated, "I guess Pete is the best man for you." Reed testified that he did not know Russell but knew Brewer and Russell had been in a relationship. Reed also said that Brewer was afraid of Russell.

Kennedy's probable cause affidavit stated that Reed told him Russell had been harassing Brewer, and that Brewer told him on the night of the murder that Russell had come over to her house and tried to force entry.

Deborah Calhoun, Brewer's best friend for about six years, also testified at trial regarding the relationship between Russell and Brewer, who she said were in love with each other. Calhoun said she was friends with both Brewer and Russell and talked to them both daily during the last two weeks of Brewer's life. Calhoun testified that Russell had left a handwritten letter at Brewer's house around August 3, 2001. The letter, which was introduced as an exhibit at trial, stated:

> Tanjala, you are a good person. At the same time you have a dope-smoking habit. You have lied, stole and cheated all in the name of crack. I cannot trust you [no] more. You are evil and out to hurt me. You mean well, but the drugs keep on calling you. I don't need you [no] more. So go back to your X X X X.

When asked about Brewer's demeanor when she read the letter, Calhoun answered, "We never thought nothing of the letter. We just laughed it off." However, Calhoun also testified that Brewer was afraid and scared of Russell during the last two weeks of her life. Calhoun also recounted incidents of jealousy on the parts of both Russell and Brewer.

Calhoun testified that Russell had taken Karen Foster to Brewer's house once when she was there and indicated Foster was his girlfriend.

Calhoun said she did not know Brewer was working as an informant. More importantly, Calhoun said that Russell never gave her the impression he knew Brewer was an informant. Following that statement, the court took a short recess. After the break, the prosecutor asked Calhoun whether Russell had ever indicated to her that he knew Brewer set him up. Calhoun responded affirmatively and said Russell was angry about it around the beginning of July 2001.

On cross-examination, Calhoun said Russell was not sure whether Brewer had set him up, but that he had said "a lot of people in the neighborhood told him that she done it." Calhoun indicated Russell's uncertainty stemmed from him still loving Brewer, and that he had never told her anything about wanting to retaliate against Brewer. Further, Calhoun said that toward the end of July or the beginning of August, Russell had shown her the ring that was in his possession at the time of his arrest and indicated it was for Brewer. Calhoun testified that she told Russell that Brewer was not going to accept the ring.

Bush, who was the undercover officer Brewer introduced to Russell as her nephew, testified that he saw Russell twice after the drug sting in which Russell and Foster were arrested. The first time Bush saw Russell was just a few weeks after Russell's arrest in May 2001. Russell was walking out of the jail as Bush was going into the jail. The second time, Brewer brought Russell with her on July 20, 2001 to pick up payment for informant work on another case. However, Bush said Russell did not exit the car, which was about 100 yards away, and neither saw him nor Brewer getting in his car. Bush also testified he questioned Brewer about bringing Russell and she said it was not

Russell but that it was an older man who lived near her neighborhood and gave her a ride.

Russell testified at trial that he and Brewer had dated for about a year-and-a-half.  He said their relationship broke down after he got arrested.  Russell also said Foster was not his girlfriend, but rather a woman he worked with at the retirement home.  Russell said that, after he bonded out on the drug charge, he contacted Brewer and the following exchange occurred: "When I called her and asked her what happened she said, 'Baby, don't get mad.  I heard what happened.  I'm trying to get in touch with my nephew right now.'"  Russell said he believed her.  Russell said Brewer told him about Reed, and he was suspicious, but she said Reed was just a friend.

Russell said that he knew Brewer used drugs and that she had asked him for drugs.  He also said she would get drugs from Donald Ray Hawkins.  Russell said he was jealous of Brewer's relationship with Hawkins because he once caught her laying across his bed in the motel where Hawkins lived.

Russell testified that he had purchased the wedding ring for Brewer around August 1 and planned to give it to her the night she was murdered.  Russell said Brewer had called him and asked him to give her some money for drugs.  He said he took the ring when he went to her house with the intention of proposing to her.  Russell said he arrived close to 1 a.m.  He testified that, as Brewer was sitting on the bed smoking crack, he inquired as to where she was going to get drugs and she said: "I'm going to get it down the street from Donald Ray [Hawkins]."  Russell said he told Brewer, "no," and the couple got into a very heated argument.  Russell testified that the following then transpired:

> And I just told her, You act like you fucking Donald Ray, like that.

> Then she had picked up a knife a kitchen knife that she had on the table.  She picked up a kitchen knife.  She said, I am fucking him Pete.  I been fucking him.
>
> That's when I picked up a knife off the table and I called her a bitch.  I called her a bitch.
>
> And she said, Fuck you, Pete.  Fuck you, Pete.
>
> She came at me with a knife and, and I pulled my hand up.  She cut me across my hand.  I began just to out of anger and rage, I just began to stab her and stuff.

Russell said that he felt like he "had been played, you know what I am saying, messed over after all I did."

Russell said that he fainted after he stabbed Brewer, and when he came to, a voice in his head that be believed to be God was telling him, "Tell them who I am."  So, he wrote on the wall and mirror in blood.  He further said that the body and house were staged to represent the five elements of the universe: Earth, wind, fire, water and air.  Russell said that he put the crack pipe back in Brewer's hand to represent "the hurt" and "her habit.  This was her hell."

Russell said, after murdering Brewer, he first went home, then to hide out at a bayou behind his childhood elementary school, and then to the motel, where he stayed a couple of days before being arrested.  He said he took the rat poison because the voice told him to "come home."

Russell claimed he did not know Brewer had set him up until Kennedy told him at the hospital, "I know all about it.  I know your girl set you up with the law."  Russell said Kennedy also told him that he knew Brewer was "messing" with Hawkins.  Russell testified that he did not stab Brewer because she informed on him; he stabbed her because she told him she was having sex with Hawkins and then cut his hand.

No. 19-70015

Officer Richard Moreno accompanied Russell in the ambulance after his arrest. Moreno testified on rebuttal that Russell told him the diamond ring in his watch pocket was for his girlfriend, Foster, who was in jail on the same drug case in which Brewer had set up Russell. Further, Russell said he and Foster were going to be married when she made bond. However, Moreno did not include any of that in his report, and Kennedy testified that Moreno refrained from conversation with Russell in the ambulance.

At the close of that portion of the trial, the jury convicted Russell of capital murder. During the penalty phase, jurors were responsible for answering two special issues:

### SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Pete Russell, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?

### SPECIAL ISSUE NO. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Pete Russell, Jr., that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

The jury answered the first special issue submitted under Art. 37.071 of the Texas Code of Criminal Procedure Section 2(b)(1) affirmatively and answered the second special issue under Section 2(e)(1) negatively. *See* Tex. Code Crim. P. Art 37.071 §§ 2(b)(1), (e)(1). Those answers required the imposition of the death penalty. See Tex. Code Crim. P. Art. 37.071 § 2(g). Accordingly, the trial court sentenced Russell to death.

No. 19-70015

Russell appealed his conviction and sentence to the Texas Court of Criminal Appeals (TCCA), which affirmed. *Russell v. State* (*Russell I*), 155 S.W.3d 176 (Tex. Crim. App. 2005). Russell then unsuccessfully sought state habeas relief, asserting that counsel: 1) Provided deficient performance in the investigation and presentation of punishment-phase evidence; 2) ineffectively selected a guilt/innocence defense, primarily by not presenting evidence that Russell killed in a jealous rage and had previously acted violently when a relationship ended; and 3) failing to object to the state's jury argument that lessened the burden of proof. Trial counsel provided an affidavit in response to Russell's claims of ineffectiveness, and both sides submitted proposed findings of fact and conclusions of law. The state court adopted the state's proposed findings and conclusions and recommended that the Court of Criminal Appeals deny relief, which it did. *Ex parte Russell* (*Russell II*), No. WR-78,128-01, 2013 WL 6212211, *1 (Tex. Crim. App. Nov. 27, 2013).

Russell then filed a federal petition for writ of habeas corpus under 28 U.S.C. § 2254 of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, raising nine claims: 1) Insufficiency of the evidence to support capital murder; 2) ineffective assistance of trial counsel for failing to argue that the state did not prove retaliation; 3) ineffective assistance of appellate counsel for failing to challenge the sufficiency of the evidence; 4) ineffective assistance of trial counsel for failing to investigate and present evidence that Russell did not kill the victim in retaliation; 5) that the state violated *Brady v. Maryland* by failing to produce the ring seized by police; 6) that the prosecutor's arguments regarding mitigating evidence violated Russell's constitutional rights; 7) ineffective assistance of trial counsel for failing to investigate and present mitigating evidence; 8) ineffective assistance of trial counsel for failing to investigate and present evidence that Russell would not be a future danger to society; and 9) that the state habeas

11

court violated Russell's rights by not holding a hearing.  The district court stayed the action to allow Russell to exhaust claims in state court.

Russell sought permission to file a successive state habeas petition. The TCCA found that Russell did not satisfy the requirements of Article 11.071, §5(a) to file a successive habeas petition and dismissed the application as an abuse of the writ without considering the merits.  *Ex parte Russell* (*Russell III*), No. WR-78,128-02, 2017 WL 912158, *1 (Tex. Crim. App. March 8, 2017).

Russell returned to federal court and filed an amended petition.  The state moved for summary judgment.  The district court granted summary judgment, denied Russell's petition for habeas with prejudice, and denied a COA.  *Russell v. Davis* (*Russell IV*), 4:13-CV-3636, 2019 WL 3302719 (S.D. Tex. July 23, 2019).  Russell subsequently filed this application for a COA raising six issues.

## STANDARD OF REVIEW

Under AEDPA, a petitioner must obtain a COA as a jurisdictional prerequisite to appeal the denial of habeas relief.  28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  A COA will be granted only "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

When the district court rejects constitutional claims on the merits, this court conducts a threshold inquiry and issues a COA if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Miller-El*, 537 U.S. at 336, 338.  This threshold inquiry does not require full consideration of the factual or legal bases supporting the claims.  *Id.* at 336.

Where the district court rejects a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue if the petitioner "shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Each component of the § 2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 485.

In death penalty cases, any doubt about whether a COA should issue is resolved in the petitioner's favor. *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

## DISCUSSION

### I. Whether the evidence failed to show that Russell's murder of Brewer was in the course of committing the defined offense of retaliation.

Russell asserts that the evidence failed to show that he murdered Brewer in the course of committing the offense of retaliation. Russell argues that he's not making a typical insufficiency claim. Instead, he asserts that he is arguing a question of statutory interpretation as to Texas Penal Code section 19.03(a)(2).

At the time of the offense, the capital murder statute stated, in relevant part:

> (a) A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:
>
> . . .

13

> (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation . . .;

Tex. Penal Code §19.03(a)(2).

Russell cites *Riles v. State*, 595 S.W.2d 858 (Tex. Crim. App. 1980), and *Griffin v. State*, 491 S.W.3d 771 (Tex. Crim. App. 2016), for the definition of "in the course of committing or attempting to commit." In *Riles*, the defendant argued that the jury charge was fundamentally defective because the indictment alleged he committed capital murder while "in the course of committing the offense of robbery" while the charge instructed the jury that it must find he "was then and there in the course of committing or attempting to commit the offense of robbery." The TCCA found no error, stating:

> The phrase "in the course of committing or attempting to commit . . ." as used in Sec. 19.03(a)(2), supra, is not defined in the Penal Code. Section 29.01(1) of the code, however, does define "In the course of committing theft." That phrase is given the definition of "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." We similarly construe the phrase of Sec. 19.03(a)(2) to mean conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense, i.e., in this case, of robbery.

*Riles*, 595 S.W.2d at 862. The TCCA reasserted that definition in *Griffin*, 491 S.W. 3d at 774-75 ("The parties agree that, as used in Texas Penal Code section 19.03(a)(2), 'in the course of committing' is defined as conduct occurring during an attempt to commit, during the commission of, or in immediate flight from, the forbidden behavior.").

14

No. 19-70015

The underlying offense here was retaliation. Texas Penal Code Section 36.06 sets out the offense of Obstruction or Retaliation and states, in relevant part:

> (a) A person commits an offense if the person intentionally or knowingly harms or threatens to harm another by an unlawful act:
>
> > (1) in retaliation for or on account of the service or status of another as a:
> >
> > (A) public servant, witness, prospective witness, or informant; . . .

Tex. Penal Code § 36.06(a)(1)(A).

Russell asserts that the evidence did not establish beyond a reasonable doubt that he was in the course of committing or attempting to commit the offense of retaliation; he asserts the evidence only supported murder, not capital murder. The state asserts that the district court properly found this claim to be procedurally barred and, alternatively, meritless.

As the district court found, Russell did not raise this claim on direct appeal or state habeas review; he raised it for the first time in his federal habeas petition. When Russell exhausted his claims in the successive state habeas proceedings, the TCCA found that he had failed to satisfy the requirements of Article 11.071 § 5(a) and dismissed the application as an abuse of the writ without considering the merits of this claim. *See Russell III*, 2017 WL 912158 at *1. The district court then determined that Russell did not meet his burden of overcoming the procedural bar and, alternatively, the claim was without merit. *See Russell IV*, 2019 WL 3302719 at *9-10.

Federal habeas courts lack the power to review a state court's decision not to address a petitioner's federal claims if the state court made that decision because the petitioner failed to meet a state procedural requirement

15

and the state judgment is based on independent and adequate state procedural grounds. *See Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (citing *Maples v. Thomas*, 565 U.S. 266, 280 (2012)); *see also Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). However, "[a] federal court may consider the merits of a procedurally defaulted claim if the petitioner shows 'cause for the default and prejudice from a violation of federal law.'" *Canales*, 765 F.3d at 562 (quoting *Martinez v. Ryan*, 566 U.S. 1, 10 (2012)).

Here, the state court dismissed Russell's application as an abuse of the writ under Article 11.071. In *Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008), we reiterated: "This court has held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar." *Id.* at 342. Thus, the district court lacked the power to review the state court's decision.

Russell argues that the obstacle of a procedural bar could be avoided if this court certified a question to the TCCA under Rules 74.1 and 74.2 of the Texas Rules of Appellate Procedure. Russell's brief is unclear as to whether he is asking this court to certify a question to the state court to interpret the meaning of "in the course of committing or attempting to commit" or to certify the insufficiency issue the state court previously declined as an abuse of the writ. Either way, we disagree.

This court has said that "absent genuinely unsettled matters of state law, we are reluctant to certify." *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1247 (5th Cir. 1997). Moreover, "the absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification." *Id.*

Russell acknowledges that the state court has already determined the meaning of "in the course of committing or attempting to commit." *See*

*Riles*, 595 S.W.2d at 862; *see also Griffin*, 491 S.W.3d at 774-75; and *Shuffield v. State*, 189 S.W.3d 782, 791 (Tex. Crim. App. 2006) ("Evidence is sufficient to support a capital murder conviction if it shows an intent . . . which was formed before *or contemporaneously with* the murder.") (emphasis original). Rather than establish any unsettled question, Russell instead essentially asserts that, based on those cases, the facts of his case were not sufficient to prove he was in the course of committing or attempting to commit retaliation. Certification is not appropriate here.

As stated previously, to overcome the procedural bar, Russell must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether the district court was correct in its procedural ruling. He is unable to do so. Further, assuming arguendo that Russell could overcome the procedural bar, he has failed to make a substantial showing of the denial of a constitutional right.

The district court alternatively concluded that there was evidence to support retaliation and rejected any notion of a requirement that Russell intended to kill Brewer in retaliation for informing on him when he went to her house.

A sufficiency of the evidence claim is evaluated under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979), which stated that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis original). The *Jackson* court also said, "[t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

The Supreme Court has also said the following:

17

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (internal marks and citations omitted).

"Habeas relief under section 2254 on a claim of insufficient evidence is appropriate only if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *West v. Johnson*, 92 F.3d 1385, 1393 (5th Cir. 1996).

Russell asserts that the only evidence as to the facts of the killing fail to show that he was committing or attempting to commit retaliation when he killed Brewer. Further, he asserts there was no evidence he ever told officers "anything like 'I was determined to get even' or 'I wanted to make an example out of her.'" However, Russell fails to cite any authority setting out such a requirement.

While there clearly is evidence to indicate that Russell and Brewer were still involved in some manner, that Russell had jealous tendencies, and that perhaps another man was a contributing factor to Russell's rage, the most damning evidence of retaliation comes from Russell's own words. Immediately after his arrest, Russell told authorities that he killed Brewer because she set him up. Other individuals also testified that Brewer was

afraid of Russell. Additionally, there is evidence to indicate that Russell knew Brewer set him up. Russell was able to present his version of the facts. The jury had the responsibility to determine witness credibility, resolve conflicts in the testimony and weigh the evidence. *See Jackson*, 443 U.S. at 319.

We review the evidence in the light most favorable to the jury verdict. *United States v. Resio-Trejo*, 45 F.3d 907, 910 (5th Cir. 1995). Further, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. A jury is free to choose among reasonable constructions of the evidence." *United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (internal marks omitted). Our review of the evidentiary record here shows that they did that in favor of the state.

Thus, we deny a COA on this issue.

## II. Whether the failure to raise the sufficiency issue on appeal constituted ineffective assistance by appellate counsel.

Russell asserts that his appellate counsel was ineffective for failing to raise the sufficiency issue in his direct appeal. Russell raised this issue for the first time in his federal petition. As with the first issue, when Russell went back to state court to exhaust, the TCCA dismissed as an abuse of the writ without considering the merit. The district court found that Russell was unable to overcome the procedural bar.

To overcome the procedural bar, Russell must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether the district court was correct in its procedural ruling. He is unable to do so. Additionally, even if we looked beyond the procedural bar, Russell's claim has no merit.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner establishes ineffective assistance of counsel if he is able to show that his

counsel's performance was deficient, i.e., the "representation fell below an objective standard of reasonableness," and "the deficient performance prejudiced the defense." *Id.* at 687-88. To establish prejudice, Russell "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Additionally, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

For the reasons discussed in issue one, Russell is unable to show actual prejudice. Thus, reasonable jurists could not debate the district court's determination that this claim is procedurally barred or its alternative denial on the merits. Accordingly, we deny a COA on this issue.

**III. Whether the district court erred in holding that a claim concerning error in a prosecutor's punishment-stage argument, contrary to law regarding mitigation, was procedurally defaulted, and holding that the argument was acceptable.**

Russell asserts that the prosecution improperly misstated the law under *Penry v. Lynaugh*, 492 U.S. 302 (1989), *Tennard v. Dretke*, 542 U.S. 274 (2004), and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), in its closing argument during the punishment phase.

Russell did not raise this issue on direct appeal or in his initial state habeas. When he raised it in his successive state habeas, the TCCA deemed it barred. The district court concluded that Russell was unable to show cause or prejudice to overcome the procedural default.

Specifically, Russell takes issue with the following statements by the prosecutor during closing:

> I can't tell you what's mitigating. It's up to you. I suggest to you there is nothing mitigating in this case. Our Charge tells you that mitigating evidence is something that you believe may reduce the defendant's moral blameworthiness. In other words, something that might reduce or lessen his responsibility. Name one thing that you have heard during this trial that lessens his responsibility for brutally murdering that woman. One thing. There is none.

Also, "I suggest to you, ladies and gentlemen, that there is nothing here that honestly and truly lessens this man's responsibility, his blameworthiness, his fault."

Russell asserts that the use of "responsibility", "blameworthiness" and "fault" would imply to the jurors that evidence could only be considered mitigating if it reduced Russell's responsibility for the charged offense. Further, Russell says that argument was the repetition of an erroneous concept requiring a nexus between the mitigating evidence and the commission of the offense that has been repudiated by the Supreme Court.

Russell asserts that the prosecutor's statements were intended to limit the core principle of *Penry*, which requires that a jury be allowed to consider a wide range of potentially mitigating evidence and that the Supreme Court repudiated the faulty nexus concept in *Tennard* and prohibited jury arguments based on it in *Abdul-Kabir*.

Russell says he can overcome the procedural bar because this is new law. His trial and direct appeal briefing occurred before *Tennard* was decided, although the decision on direct appeal was not handed down until after *Tennard* was decided, and *Abdul-Kabir* was decided after the deadline for filing his state habeas application. But Russell concedes that *Tennard* and *Abdul-Kabir* derived from *Penry*, and that this is longstanding law. In fact, Russell quotes the following from *Abdul-Kabir*:

> A careful review of our jurisprudence in this area makes clear that well before our decision in *Penry I*, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

*Id.* 550 U.S. at 246. Russell does not pinpoint cite any other specific provision from *Abdul-Kabir*, *Penry* or *Tennard*. Regardless, these decisions did not create a new rule of law, but rather clarified the application existing precedent. *See Abdul-Kabir*, 550 U.S. at 263; *see also Tennard*, 542 U.S. at 285.

Here, the district court found that "Russell's challenge to the State's argument is not so novel that any of his earlier attorneys could not have raised the same claim, and that he was unable to show cause to overcome the procedural bar." *Russell IV*, 2019 WL 3302719 at *18. The district court also found the claim to be without merit.

We agree that Russell is unable to show cause to overcome the procedural bar. He is also unable to show prejudice.

In between the two statements Russell takes issue with, the prosecutor said:

> You might see it differently. If you do, I want you to understand what this question really asks you, the second question. Maybe you do [sic] something that's mitigating. The issue is: Is it sufficiently mitigating? Does it rise to that level of sufficiency, whatever that is for you, that it warrants that he should get life instead of death?

Earlier in the argument, the prosecutor also explained, "[r]esponsibility is one thing. We have done that, but here in this part of the

trial, we're focusing on his culpability." The prosecution also told the jurors they could decide what amounted to mitigating evidence.

Moreover, as the district court said, "[t]he trial court instructed jurors to consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendants [sic] background, character, or the circumstances of the offense that mitigates against the imposition of the death penalty." *Russell IV*, 2019 WL 3302719 at *18 (internal marks omitted). The trial court repeatedly instructed the jury to consider all the evidence and said: "You shall consider all evidence submitted to you during the whole trial as to the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."

Also, as Russell acknowledges, his counsel told the jury to take a broad view of mitigation and look at all of the mitigating evidence in deciding how to answer the mitigation special issue. There is no indication that the jury did not follow the instructions.

For these reasons, we deny a COA on this issue.

## IV. Whether the district court erred in holding that trial counsel provided an adequate defense on the topic of mitigation.

Russell asserts that his trial counsel failed to provide an adequate defense on the issue of mitigation. Specifically, Russell asserts that counsel only presented anecdotal evidence from Russell's acquaintances but failed to present expert testimony to the put the anecdotal evidence in the context of the mitigation special issue. Russell also asserts that counsel missed some mitigating factors altogether.

Russell focuses on the lack of an expert such as forensic psychologist, Mark Cunningham, who provided a report for Russell's state habeas. To be clear, Russell says he "is not saying that Cunningham himself should have

been called as a witness, since a particular expert witness might not be available at a given time, or the trial court might not provide enough funding." Rather, he says counsel should have called "some competent witness" to "connect the dots."

Russell points to a list of "adverse developmental factors" that Cunningham determined were present in Russell's background: Generational family dysfunction; mother's teenage status at outset of childbearing; father abandonment; learning disabilities, attention and concentration problems, and school failure; bullied by peers; child neglect; inadequate parental supervision and guidance, with mother's acceptance of drug trafficking proceeds; corruptive influence of extended family; chronic poverty; alcoholism of stepfather; chronic emotional estrangement and hostility in relationship of mother and step-father; corruptive community influences; teen onset drug trafficking; community violence exposure with gunshot victimization and victimization of family; evidence of severe psychological disorder; and pathological relationship with Tanjala Brewer. Russell also cites Cunningham's explanation of the significance of those factors as applied to Russell. In doing so, Russell asserts that counsel should have done more.

Russell exhausted this claim in state court, which found it to be without merit. The district court discussed the state habeas court's findings at length before engaging in its own analysis under the "doubly deferential" standard created by *Strickland* and 28 U.S.C. § 2254(d) and finding no merit. *Russell IV*, 2019 WL 3302719 at *20 (citing *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

Under *Strickland*, as quoted above, Russell establishes ineffective assistance of counsel if he is able to show that counsel's performance was deficient, and the deficient performance prejudiced the defense. *Id.* 466 U.S.

at 687-88. Deficient performance is that which falls below an objective standard of reasonableness. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91.

As to mitigation, this court has said: "In investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). Under *Strickland*, counsel cannot ignore "pertinent avenues of investigation." *Id*. at 390.

Russell must demonstrate that it was necessarily unreasonable for the state habeas court to conclude that he did not overcome the strong presumption of counsel's competence and that he failed to undermine confidence in the jury's sentence of death. *See Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Russell also must demonstrate that the state court's decision was contrary to or involved an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d).

The record does not establish that Russell's counsel failed to conduct a reasonable investigation. Counsel obtained a mitigation specialist, conducted numerous interviews with Russell, his family members and friends, and developed a strategy. The strategy was basically that Russell was a good person who had a rough life and killed Brewer in a jealous rage over another man. This court has refused to find *Strickland* error in a case where

counsel employed a similar strategy, calling it a "coherent theory to support a life sentence." *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007).

While counsel here did not call an expert during the penalty phase, counsel did call ten witnesses, including Russell's mother, sister, brother, three aunts, two uncles, and two friends. The testimony of these witnesses painted a picture of the defendant being raised in Houston's Fifth Ward, where drug-dealing and violence were common; being abandoned by his father; living in poverty without proper parental supervision; having a mother who had to work two jobs and received food stamps; having family members who were involved in crime, tried to lead him astray, and in prison; and never having much of a chance.

In other words, these witnesses testified to most of the factors Russell cites from Cunningham. Of the factors that were not covered, trial counsel said, during discussions with witnesses, there was never any indication Russell was bullied or suffered from attention problems. Additionally, regarding the claim that Russell suffered from a psychological disorder or had reacted violently with a previous girlfriend, counsel said any such evidence would have been counter-productive to the theory that this was a one-time incident and Russell was not a future danger.

Moreover, a petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Id.*

Russell fails to allege with specificity how additional investigation or testimony would have altered the outcome of the trial. He is also unable to demonstrate that Cunningham would have testified or how it would have been favorable. Instead, Russell acknowledges that he is not saying Cunningham himself should have been called, but rather that "some competent witness" could have been found to "connect the dots" and essentially expand on the evidence introduced by the ten witnesses the defense called.

Russell essentially asserts that counsel could have done more. But, the standard is not whether counsel could have done more. Further, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689.

Because Russell is unable to show that reasonable jurists would debate whether the state court's denial of his claim was unreasonable, we deny a COA on this claim.

## V. Whether trial counsel provided ineffective assistance by failing to develop evidence regarding future dangerousness which could have been persuasive at the punishment stage of trial.

Russell asserts that his trial counsel failed to present expert testimony or empirical evidence from a forensic psychologist on the issue of whether Russell would be a future danger to society. Again, Russell cites Cunningham's report.

Russell exhausted this issue in state court. The district court discussed the state court's findings and then found, as follows:

> Russell does not acknowledge the state court findings to which this Court must defer, much less show by clear and

> convincing evidence that they are incorrect.  At its heart,
> Russell's argument is simply that counsel should have adopted
> a different strategy at the penalty phase.  A reasonably [sic]
> attorney could come to the conclusion that academic
> discussion about crime statistics could be less effective than lay
> testimony, and in fact could weaken that testimony.  The Court
> finds that Russell has not shown that the state habeas court's
> rejection of this claim was contrary to, or an unreasonable
> application of, federal law.

*Russell IV*, 2019 WL 3302719 at *22.

During the penalty phase of Russell's trial, the state presented evidence and testimony that included the following: Russell was sentenced to nine years in prison for aggravated assault under a plea bargain in 1991 for shooting Devarick Williams six times after Williams had a minor altercation with Russell's brother; that same year, Russell was convicted of aggravated robbery which involved him holding a gun to a store manager's head and forcing him to open a safe; Russell was convicted of delivery of drugs in the conviction that resulted from Brewer informing on him; and other unadjudicated offenses and bad acts committed by Russell.  The state also presented a pen packet and a stipulation of evidence in which Russell stipulated he was the same person who was convicted in the above-listed crimes.

As discussed in issue four above, the defense called ten witnesses who testified about Russell's difficult background.  The strategy focused on Russell as a person, rather than expert testimony.  Defense counsel also introduced disciplinary records from Russell's prior incarceration which indicated he had not had many serious infractions.

Russell takes issue with one finding by the state habeas court, but that was not the court's only finding as to this issue.  The state court also found, based on trial counsel's affidavit, that counsel believed evidence of Russell's

life and background was more effective than studies of convicted murderers. The gist of Russell's argument, as supported by Cunningham's report, is that counsel should have done more, i.e., should have called an expert to contextualize the evidence presented, and to provide statistics, scientific data and general information. We discussed such an argument in issue four, and we conclude the same here.

Because Russell is unable to show that reasonable jurists would debate whether the state court's denial of his claim was unreasonable, we deny a COA on this claim.

**VI. Whether Russell was denied due process of law in the state habeas system.**

Russell asserts that he raised this issue "but the courts ignored it."[2] Russell raised ineffective assistance of counsel for failure to develop evidence regarding future dangerousness, as discussed in issue five. But he failed to raise this issue regarding a denial of due process in his initial state habeas action. When he raised it in his successive state habeas, the TCCA deemed it barred. The district court concluded that Russell was unable to overcome the procedural bar. The district court also concluded that, even if it could reach the merits of the claim, Russell would not be entitled to federal habeas relief under *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) ("[E]rrors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief.").

Russell is unable to show that reasonable jurists would debate whether the petition states a valid claim of the denial of a constitutional right and that

---

[2] As with much of his argument, this issue is hard to follow in Russell's application. He also fails to provide adequate record citations or applicable authority.

No. 19-70015

jurists of reason would find it debatable whether the district court was correct in its procedural ruling. So, we deny a COA on this claim.

## CONCLUSION

For these reasons, Russell has not made the showing required to obtain a COA and his application is DENIED.